# 26-49

## United States Court of Appeals
## for the Second Circuit

IN RE GOL LINHAS AÉREAS INTELIGENTES S.A.

*Debtor,*

GOL LINHAS AÉREAS INTELIGENTES S.A.,

*Debtor-Appellant,*

v.

WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE FOR REGION 2,

*Trustee-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York
No. 1:25-cv-04610 (Cote, J.)

**OPENING BRIEF OF DEBTOR-APPELLANT
GOL LINHAS AÉREAS INTELIGENTES S.A.**

EVAN R. FLECK
LAUREN C. DOYLE
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5567
efleck@milbank.com

ANDREW M. LEBLANC
COLLEEN E. ROH SINZDAK
*Counsel of Record*
ERIN E. DEXTER
HANNAH A. BLAZEK
CHASE J. HANSON
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
(202) 835-7570
crohsinzdak@milbank.com

April 22, 2026

*Counsel for Debtor-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and (c), the above-captioned Debtor-Appellant respectfully represents:

All Debtor entities in the above-captioned bankruptcy proceedings were: GOL Linhas Aéreas Inteligentes S.A.; GOL Linhas Aéreas S.A.; GTX S.A.; GAC, Inc.; Gol Finance (Luxembourg); Gol Finance (Cayman); Smiles Fidelidade S.A.; Smiles Viagens e Turismo S.A.; Smiles Fidelidade Argentina S.A.; Smiles Viajes y Turismo S.A.; Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior; Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior; and Gol Equity Finance.

As of April 1, 2026, reorganized Debtor entities GOL Linhas Aéreas Inteligentes S.A. and GOL Linhas Aéreas S.A. merged with non-Debtor GOL Investment Brasil S.A. into GOL Linhas Aéreas S.A.

As of the date hereof, 99.89% of the equity interests of GOL Linhas Aéreas S.A. are held by New Gol Parent S.A. As of the date hereof, 78.48% of the equity interests of New Gol Parent S.A. are held by Abra

i

Global Finance. No other entity holds over 10% of the equity interests of New Gol Parent S.A.

GOL Linhas Aéreas S.A. holds 100% of the equity interests of reorganized Debtors GTX S.A., GAC, Inc., Gol Finance (Luxembourg), Gol Finance (Cayman), Smiles Fidelidade S.A., Smiles Viagens e Turismo S.A., Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior, and Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior.

GOL Linhas Aéreas S.A. holds 95% of the equity interests of reorganized Debtor Smiles Fidelidade Argentina S.A.

Smiles Fidelidade Argentina S.A. holds 98% of the equity interests of reorganized Debtor Smiles Viajes y Turismo S.A.

Non-Debtor Stichting Holding GOL Equity Finance holds 99.997% of the equity interests of reorganized Debtor Gol Equity Finance.

ii

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 6

STATEMENT OF ISSUE FOR REVIEW ................................................. 7

STATEMENT OF THE CASE ................................................................. 7

I.    STATUTORY FRAMEWORK ......................................................... 7

II.   FACTUAL BACKGROUND ...................................................... 10

III.  PROCEDURAL HISTORY ....................................................... 15

STANDARD OF REVIEW ................................................................... 18

SUMMARY OF ARGUMENT ............................................................... 19

ARGUMENT ..................................................................................... 25

I.    SECTION 1123(b)(6) AUTHORIZES THE INCLUSION OF OPT-OUT
THIRD-PARTY RELEASES IN A BANKRUPTCY PLAN ........................... 25

      A.    *Energy Resources* And *Purdue* Establish The
Requirements For A Bankruptcy Plan Provision Under
Section 1123(b)(6) ....................................................... 26

      B.    Opt-Out Third-Party Release Provisions Satisfy The
Requirements Established In *Energy Resources* and
*Purdue* .................................................................... 31

           1.    Opt-out releases are often "necessary" to a
successful reorganization ........................................ 32

           2.    Opt-out releases are "similar in nature" to the
plan provisions Section 1123 expressly
enumerates .......................................................... 33

iii

**TABLE OF CONTENTS—Continued**

<u>Page</u>

3. Opt-out releases are consistent with the numerous Bankruptcy Code provisions permitting creditors to give implied consent to the relinquishment of their rights ............................... 35

C. The Use of Opt-Out Consent In Class Actions Supports The Validity Of Opt-Out Release Provisions ........................ 41

II. THE TRUSTEE'S ARGUMENTS TO THE CONTRARY ARE WRONG ......... 43

A. Federal Bankruptcy Law Governs The Question Of Whether Opt-Out Consent Is Permissible ........................... 44

B. Contract Law Does Not Apply ................................................ 46

C. Even If Contract Law Applies, The Opt-Out Releases Are Valid ................................................................................. 52

D. The Trustee's Remaining Arguments Lack Merit ................ 55

E. The Trustee Is Alone In Objecting To The Opt-Out Consent Procedures ............................................................... 60

CONCLUSION ..................................................................................... 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

Page(s)

*Am. Prairie Constr. Co.* v. *Hoich,*
594 F.3d 1015 (8th Cir. 2010)......................................................51, 52

*Conn. Nat'l Bank* v. *Germain,*
503 U.S. 249 (1992) ........................................................................6, 7

*E. Equip. & Servs. Corp.* v. *Factory Point Nat'l Bank,*
236 F.3d 117 (2d Cir. 2001) ..............................................................44

*Epic Sys. Corp.* v. *Lewis,*
584 U.S. 497 (2018) ...........................................................................9

*Erie R.R. Co.* v. *Tompkins,*
304 U.S. 64 (1938)............................................................................46

*Fikes Wholesale, Inc.* v. *HSBC Bank USA, N.A.,*
62 F.4th 704 (2d Cir. 2023)..........................................................56, 57

*FutureSource LLC* v. *Reuters Ltd.,*
312 F.3d 281 (7th Cir. 2002)..............................................2, 3, 33, 34

*Hanna* v. *Plumer,*
380 U.S. 460 (1965) ..........................................................................46

*Harrington* v. *Purdue Pharma L.P.,*
603 U.S. 204 (2024) ....................... 1, 3, 9, 19, 21, 26, 28, 29, 30, 31, 43

*Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, NA,*
747 F.3d 44 (2d Cir. 2014) ................................................................18

*In re Adelphia Commc'ns Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007).................................................38

*In re Andrews,*
49 F.3d 1404, 1409 (9th Cir. 1995)................................................38, 39

v

# TABLE OF AUTHORITIES—Continued

Page(s)

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021) .......................................56, 57, 60

*In re Azul S.A.*,
676 B.R. 277 (Bankr. S.D.N.Y. 2026) .......................................53, 54, 61

*In re Barton Indus., Inc.*,
104 F.3d 1241 (10th Cir. 1997) ...........................................................59

*In re Borders Grp., Inc.*,
453 B.R. 477 (Bankr. S.D.N.Y. 2011) ...........................................33, 34

*In re Calpine Corp.*,
2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) ..........................60

*In re Colarusso*,
295 B.R. 166 (1st Cir. BAP 2003) ................................................33, 34

*In re Coltex Loop Cent. Three Partners, L.P.*,
138 F.3d 39 (2d Cir. 1998) ..................................................................6

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000) ............................................................8, 9

*In re Container Store Grp., Inc.*,
676 B.R. 356 (S.D. Tex. 2026)............................................................61

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ................................................60

*In re DBSD N. Am., Inc.*,
627 F.3d 496 (2d Cir. 2010) ..............................................................60

*In re DeCelis*,
349 B.R. 465 (Bankr. E.D. Va. 2006) .................................................41

# TABLE OF AUTHORITIES—Continued

Page(s)

*In re Digit. Impact, Inc.*,
223 B.R. 1 (Bankr. N.D. Okla. 1998)....................................................41

*In re Ditech Holding Corp.*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019) ..............................................60

*In re Energy Res. Co., Inc.*,
59 B.R. 702 (Bankr. D. Mass. 1986)..................................................27

*In re Facciponte*,
1992 WL 722289 (Bankr. N.D.N.Y. 1992)............................................39

*In re Frontier Ins. Grp., Inc.*,
585 B.R. 685 (Bankr. S.D.N.Y. 2018) ..............................................46

*In re Frontier Ins. Grp., Inc.*,
598 B.R. 87 (S.D.N.Y. 2019) ............................................................46

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ..............................................60

*In Re Gol Linhas Aéreas Inteligentes S.A.*,
675 B.R. 125 (S.D.N.Y. 2025) ..........................................................17

*In re Harvey*,
213 F.3d 318 (7th Cir. 2000)............................................................38

*In re Hopeman Bros., Inc.*,
2025 WL 3688940 (Bankr. E.D. Va. Oct. 31, 2025) ........................2, 35

*In re LATAM Airlines Grp. S.A.*,
2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ........................60

*In re Lutheran Home & Servs. for the Aged, Inc.*,
--- B.R. ---, 2026 WL 626606 (N.D. Ill. Mar. 4, 2026) ........................61

# TABLE OF AUTHORITIES—Continued

Page(s)

*In re Mallinckrodt PLC,*
639 B.R. 837 (Bankr. D. Del. 2022)....................................................60

*In re Manuel Mediavilla, Inc.,*
568 B.R. 551 (BAP 1st Cir. 2017)........................................................51

*In re Metromedia Fiber Network, Inc.,*
416 F.3d 136 (2d Cir. 2005) ................................................. 1, 8, 21, 43

*In re Motors Liquidation Co.,*
943 F.3d 125 (2d Cir. 2019) ................................................................18

*In re N. New England Tel. Operations LLC,*
795 F.3d 343 (2d Cir. 2015) ................................................................59

*In re Omni Video, Inc.,*
60 F.3d 230 (5th Cir. 1995)...........................................................50, 51

*In re Pence,*
905 F.2d 1107 (7th Cir. 1990)........................................................40, 41

*In re Roberts,*
249 B.R. 152 (Bankr. W.D. Mich. 2000)............................................41

*In re Robertshaw US Holding Corp.,*
662 B.R. 300 (Bankr. S.D. Tex. 2024) ...............................................60

*In re Ruti-Sweetwater, Inc.,*
836 F.2d 1263 (10th Cir. 1988)...................................................2, 3, 38

*In re Sabine Oil & Gas Corp.,*
555 B.R. 180 (Bankr. S.D.N.Y. 2016)................................................60

*In re Smallhold, Inc.,*
665 B.R. 704 (Bankr. D. Del. 2024) ...................................................48

# TABLE OF AUTHORITIES—Continued

Page(s)

*In re Specialty Equip. Cos.*,
3 F.3d 1043 (7th Cir. 1993) ......................................................... 8, 9

*In re Spirit Airlines, Inc.*,
668 B.R. 689 (Bankr. S.D.N.Y. 2025) ..................................... 53, 54, 60

*In re Szostek*,
886 F.2d 1405 (3d Cir. 1989) ............................................................ 38

*In re TE Holdcorp LLC*,
2023 WL 418059 (3d Cir. Jan. 26, 2023) ...................................... 33, 34

*In re Teligent, Inc.*,
282 B.R. 765 (Bankr. S.D.N.Y. 2002) ................................................ 39

*In re Zarnel*,
619 F.3d 156 (2d Cir. 2010) ............................................................. 60

*Langenkamp* v. *Culp*,
498 U.S. 42 (1990) ...................................................................... 39, 54

*Luria Bros & Co.* v. *All. Assurance Co.*,
780 F.2d 1082 (2d Cir. 1986) ........................................................... 40

*Perfect Fit Indus., Inc.* v. *Acme Quilting Co.*,
646 F.2d 800 (2d Cir. 1981) ............................................................. 40

*Phillips Petrol. Co.* v. *Shutts*,
472 U.S. 797 (1985) ................................................. 4, 21, 42, 52, 59

*Ritzen Grp. Inc.* v. *Jackson Masonry, LLC*
589 U.S. 35 (2020) ........................................................................... 6

*Roell* v. *Withrow*,
538 U.S. 580 (2003) .................................................................. 36, 37

ix

# TABLE OF AUTHORITIES—Continued

Page(s)

*Schnabel* v. *Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ........................................................ 17, 18

*Shady Grove Orthopedic Assocs., P.A.* v. *Allstate Ins. Co.*,
  559 U.S. 393 (2010) .................................................................. 45, 46

*Shaw* v. *Aurgroup Fin. Credit Union*,
  552 F.3d 447 (6th Cir. 2009) .......................................................... 38

*Sprint Nextel Corp.* v. *DBSD N. Am. Inc.*,
  2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010) ...................................... 60

*Tatko* v. *Sheldon Slate Prods. Co.*,
  769 N.Y.S.2d 626 (App. Div. 2003) .................................................. 54

*Travelers Cas. & Sur. Co. of Am.* v. *Pac. Gas & Elec. Co.*,
  549 U.S. 443 (2007) ..................................................................... 44

*United States* v. *Energy Res. Co.*,
  495 U.S. 545 (1990) ............................... 8, 19, 26, 27, 28, 31

*Wellness Int'l Network, Ltd.* v. *Sharif*,
  575 U.S. 665 (2015) ............................... 2, 3, 20, 36, 37, 41

## CONSTITUTION:

U.S. Const. art. I § 8 cl. 4 ................................................................. 44

## STATUTES:

11 U.S.C.:

  363(f) ...................................................................................... 33

  363(f)(2) .......................................................... 2, 20, 33, 45

  502(b) ...................................................................................... 45

# TABLE OF AUTHORITIES—Continued

Page(s)

510(a) ...................................................................................... 45

1123(a) ...................................................................... 34, 46, 47

1123(a)(3) ............................................................................. 7, 8

1123(a)(4) ...................................................... 7, 8, 20, 34, 45

1123(a)(5) ............................................................................. 7, 8

1123(b) ..................................................................... 34, 46, 47

1123(b)(2) .................................................................................. 8

1123(b)(3)(A) ............................................................................. 8

1123(b)(4) ............................................................................ 8, 33

1123(b)(6) ..................................................... 3, 8, 19, 25, 31

1125(c) .................................................................................... 56

1126(c) .............................................................................. 20, 38

1126(f) .................................................................................... 14

1126(g) ................................................................................... 14

1129(a)(1) ................................................................. 9, 10, 47

1129(a)(3) .......................................................... 9, 10, 23, 47

1129(a)(7) .......................................................... 9, 10, 23, 47

1129(a)(9) .............................................................. 20, 39

1129(a)(11) ............................................................................ 47

# TABLE OF AUTHORITIES—Continued

Page(s)

1129(b)(2)(A) ..................................................................... 32

1141 ................................................................................. 46

1141(a) ............................................................................. 47

28 U.S.C.:

157(b)(2)(L) ...................................................................... 6

157(c) ........................................................................ 20, 45

157(c)(2) .......................................................................... 36

158(a)(1) ........................................................................... 6

158(d)(1) ........................................................................... 6

1291 ................................................................................. 6

1292(a)(1) ...................................................................... 6, 7

1334 ................................................................................. 6

**RULE:**

Fed. R. Civ. P. 55 .......................................................... 39, 40

**OTHER AUTHORITIES:**

7 Collier on Bankruptcy ¶ 1125.02 (16th ed. 2026) ............... 57

Restatement (Second) of Contracts § 69 (A.L.I. 1981) ...... 52, 53

## INTRODUCTION

The federal Bankruptcy Code governs what may (and may not) be included in a chapter 11 bankruptcy plan—the formal, court-approved document that sets out how a debtor will be reorganized to emerge from bankruptcy as a going concern. The question in this case is whether Section 1123(b)(6) of the Bankruptcy Code authorizes a plan to include a provision that calls for some creditors to release their claims against other creditors, while giving the releasing creditors notice and an opportunity to opt out.

Multiple principles of federal law establish that Section 1123(b)(6) authorizes the inclusion of such opt-out third-party releases in a bankruptcy plan. Indeed, it is undisputed that a bankruptcy plan may include third-party releases if they are consensual. This Court recognized as much in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005). And while *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024), recently held that Section 1123(b)(6) does not permit the inclusion of "nonconsensual" third-party releases, the Supreme Court was careful to emphasize that it did not "call into question *consensual* third party releases." *Id.* at 226.

1

Whether Section 1123(b)(6) authorizes the inclusion of opt-out third-party release provisions therefore depends on whether they are consensual. Here, they are. The question of what constitutes consent for purposes of third-party releases under Section 1123(b)(6) is one of first impression. But Section 1123 and the Bankruptcy Code as a whole contain numerous provisions that permit a party to consent to relinquish its rights in a bankruptcy proceeding, and courts routinely find that these consent requirements are satisfied where a party fails to assert its rights after being given notice and an opportunity to assert them.

Most notably, the Supreme Court held in *Wellness International Network, Ltd.* v. *Sharif*, 575 U.S. 665 (2015), that a party gives its "implied consent" to the adjudication of its claims by the bankruptcy court under 28 U.S.C. 157(c) where the party is "made aware of the need for consent and the right to refuse it," and yet says nothing. *Id.* at 684-685. And courts have applied the same reasoning to find that a creditor has given its implied consent to disparate treatment under a bankruptcy plan under 11 U.S.C. 1123(a)(4), *In re Hopeman Bros., Inc.*, 2025 WL 3688940, at *18 (Bankr. E.D. Va. Oct. 31, 2025), to the sale of property in which it has a lien "free and clear" under 11 U.S.C. 363(f)(2),

2

*FutureSource LLC* v. *Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002), and even to acceptance of the whole bankruptcy plan under 11 U.S.C. 1126(c), see, *e.g.*, *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir. 1988).

The same principle applies when it comes to third-party releases included in a bankruptcy plan under Section 1123(b)(6): Where a creditor is given notice of the releases and provided an opportunity to opt out, its failure to do so may be deemed "implied consent." *Wellness*, 575 U.S. at 684-685. There can be no question that these other consent provisions of the Bankruptcy Code are highly relevant in understanding what kinds of third-party release provisions Section 1123(b)(6) permits. The text of Section 1123(b)(6) requires that any provision included under it must be "appropriate" and "not inconsistent with" the Bankruptcy Code as a whole. And in *Purdue*, the Supreme Court carefully scrutinized the other provisions of Section 1123(b) and the rest of the Bankruptcy Code to determine whether nonconsensual third-party releases met these requirements. See 603 U.S. at 215-224.

Moreover, finding that opt-out procedures are sufficient to show consent is consistent with at least two other important principles of federal law. First, a litigant in federal court is required to object when it

3

believes its rights are being infringed, and a failure to do so will be construed as consent—to the introduction of evidence, for example, or proposed jury instructions, or even to a default judgment. Because creditors are litigants in bankruptcy proceedings, their failure to opt out after receiving notice and an opportunity to do so may similarly be construed as consent. Second, the Supreme Court has held that a litigant in a class action may consent to the adjudication of its claims in a class proceeding in a court without personal jurisdiction by failing to opt out after receiving notice of the proceedings. *Phillips Petrol. Co.* v. *Shutts*, 472 U.S. 797, 811-814 (1985). Because bankruptcy proceedings are another form of collective action, it would be more than passing strange to reach a different conclusion about what is necessary to show consent in this context.

The Trustee alone disagrees. No other party to this bankruptcy— not a single one of the creditors—objected to the opt-out third-party release provision in the bankruptcy plan in this case. And the Trustee can hardly claim that is due to a lack of notice, because the opt-out provision was prominently disclosed in the Plan documents; every

releasing creditor was sent a notice of the release and given an opportunity to opt out, and many creditors did in fact opt out.

The Trustee nonetheless insists that the releases are not consensual because consent should be assessed under state contract law, and it takes the view that opt-out consent does not suffice under contract law principles. But that argument cannot be squared with the numerous precedents considering analogous questions of consent under the Bankruptcy Code without ever looking to state contract law principles. Those decisions make sense because a bankruptcy plan is *not* a contract; it is a creature of federal bankruptcy law. Its contents are dictated by federal law; it is enforceable only if it is reviewed and approved by a federal bankruptcy court; and federal law makes the plan binding on all creditors that are on notice of the plan. State contract law has nothing to say about what constitutes consent in these circumstances. And even if contract principles were somehow relevant, the result would be the same because contract law recognizes that—in circumstances like these—silence constitutes consent.

5

For all of these reasons, the overwhelming majority of courts have upheld the inclusion of opt-out third-party release provisions in a bankruptcy plan. This Court should do the same.

## JURISDICTIONAL STATEMENT

The Bankruptcy Court (Glenn, C.J.) had original jurisdiction under 28 U.S.C. 1334 and 157(b)(2)(L). The District Court (Cote, J.) had appellate jurisdiction under 28 U.S.C. 158(a)(1). This Court has jurisdiction under 28 U.S.C. 158(d)(1) and 1291 because the District Court's order is a final judgment. *In re Coltex Loop Cent. Three Partners, L.P.*, 138 F.3d 39, 40 (2d Cir. 1998).[1]

Moreover, even if the District Court's judgment was deemed non-final, this Court would have jurisdiction under 28 U.S.C. 1292(a)(1). That statute grants interlocutory appellate jurisdiction over any order "granting, continuing, modifying, refusing or dissolving injunctions."

---

[1] The Supreme Court's decision in *Ritzen Group Inc.* v. *Jackson Masonry, LLC*, 589 U.S. 35 (2020), confirms that the District Court's order is final and reviewable. *Ritzen* held that an order is final within the meaning of 28 U.S.C. 158(d)(1) where it "definitively dispose[s] of [a] discrete dispute[] within the overarching bankruptcy case." *Id.* at 37. Here, the District Court's order "definitively dispose[d]" of the discrete dispute regarding the propriety of the consensual third-party releases in GOL's chapter 11 plan.

6

*Ibid.*; see *Conn. Nat'l Bank* v. *Germain*, 503 U.S. 249, 254 (1992) ("So long as a party to a proceeding or case in bankruptcy meets the conditions imposed by § 1292, a court of appeals may rely on that statute as a basis for jurisdiction."). If this Court found that the District Court's order was interlocutory, Section 1292(a)(1) would apply because the order modified or dissolved the injunction enforcing the third-party releases in the bankruptcy plan. See JA2 ("[T]he third-party release and corresponding injunction are stricken from the Plan.").

## STATEMENT OF ISSUE FOR REVIEW

Whether Section 1123(b)(6) authorizes the inclusion of opt-out third-party releases in a bankruptcy plan.

## STATEMENT OF THE CASE

### I. STATUTORY FRAMEWORK

A. Chapter 11 of the Bankruptcy Code gives business debtors considerable flexibility to propose a plan of reorganization to restructure their debts and continue operating as a going concern. Among other things, Section 1123 of the Bankruptcy Code provides that "a plan shall" include certain terms, including "specify[ing] the treatment of any class of claims or interests that is impaired under the plan," "provid[ing] the same treatment for each claim or interest of a particular class," and

7

"provid[ing] adequate means for the plan's implementation." 11 U.S.C. 1123(a)(3), (4), (5).

Section 1123 also includes categories of terms that debtors "may" include in a chapter 11 plan, including terms that provide for "the assumption, rejection, or assignment of any executory contract or unexpired lease," "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate," and "the sale of all or substantially all of the property of the estate." 11 U.S.C. 1123(b)(2), (3)(A), (4).

As most relevant here, Section 1123 permits a debtor to include in its chapter 11 plan "any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. 1123(b)(6). A provision of a chapter 11 plan can be "appropriate" even when the Bankruptcy Code "does not explicitly authorize" its inclusion. *United States* v. *Energy Res. Co.*, 495 U.S. 545, 549 (1990). And this Court has long recognized that the Bankruptcy Code authorizes third-party releases "if the affected creditors consent." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Courts of appeals around the country have held the

8

same. *E.g. In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993).

In *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court clarified that Section 1123(b)(6) does not authorize bankruptcy courts to confirm a plan that releases creditors' claims against third parties without those creditors' consent. *Id.* at 218 ("[Section 1123(b)(6)] cannot be fairly read to endow a bankruptcy court with the 'radically different' power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants." (quoting *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 513 (2018))). But the Court made clear that nothing in its decision "should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan." *Id.* at 226.

B.     Once the parties have developed a bankruptcy plan that accords with the requirements of Section 1123, the bankruptcy court "shall" approve the plan if it satisfies 11 U.S.C. 1129.  That provision requires the court to scrutinize the plan to ensure it complies with the Bankruptcy Code and satisfies certain standards, including that the plan is in the best interests of creditors and was proposed in good faith.  11

U.S.C. 1129(a)(1), (3), (7).  At this stage, creditors and other parties in interest that oppose the plan or certain aspects of it may come forward with objections that the bankruptcy court must consider and address. Once the court is satisfied, it issues a confirmation order and the transactions, settlements, and other provisions within the confirmed plan are given effect.

## II.    FACTUAL BACKGROUND

A.    GOL is one of Brazil's largest domestic airlines with extensive operations throughout South America.  JA2.  In January 2024, GOL and several of its affiliates filed for chapter 11 bankruptcy in the Southern District of New York.  JA2-3.  After months of negotiations with creditors and other parties in interest, GOL proposed and sought confirmation of its chapter 11 plan of reorganization (the "Plan").  JA3.

Third-party releases played a central role in these negotiations. JA1399.  Some of GOL's largest creditors agreed to make valuable contributions for the Plan's success, either by relinquishing certain rights or making funding available for the reorganization.  JA1397-1399.  But in exchange, these creditors requested a provision that would release

10

certain GOL- and bankruptcy-related claims that other creditors might have against them. JA1399.

The result was the "Third-Party Release[]" provision. JA1643-1644. That provision specifies that the "Releasing Parties" will release certain claims against the "Released Parties," if and only if those Releasing Parties do not opt out after being provided with notice and an opportunity to do so. JA1643-1644.

The Plan defines the "Released Parties" to cover a set of creditors that provided valuable contributions to the Plan. JA1581. They include the Official Committee of Unsecured Creditors and its members; GOL's then-largest creditor, Abra Group Limited; the ad hoc group of Abra noteholders who funded GOL's chapter 11 cases by providing $1 billion in crucial debtor-in-possession financing; the ad hoc group of 2026 noteholders and Whitebox, creditors who made significant concessions in resolving objections to the Plan that avoided costly and protracted litigation; agents and trustees for GOL's funded debt; and "Related Parties" to each of the forgoing.[2] JA1581.

---

[2] "Related Parties" include the Released Parties' current and former "directors, managers, officers, investment committee members, special

The "Releasing Parties" are in turn defined to include a group of creditors that obtained something of value from the Plan. Specifically, the Plan provides that a "Releasing Party" must have (1) been a "holder[] of [a] Claim[]" placed in a class under the Plan—that is, have been a creditor of GOL who submitted a proof of claim or otherwise held an allowed claim; (2) declined to opt out of granting a Third-Party Release; and (3) received some recovery under the Plan. JA1581; JA1830-1831.[3] Conversely, all creditors who received no value under the Plan—meaning those creditors the Bankruptcy Code conclusively deemed to reject the Plan—were carved out of the definition of Releasing Parties and

---

committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors" and their "respective heirs, executors, estates, and nominees." JA1581.

[3]     To avoid circumvention of the Third-Party Releases, the Plan also deems "Related Parties" of creditors that qualified as Releasing Parties to grant Third-Party Releases. JA1581 ("Related Parties" definition). Additionally, all Released Parties are defined as Releasing Parties under the Plan, essentially effectuating reciprocal releases. JA1581 ("Releasing Parties" definition).

12

therefore did not grant the Third-Party Release. JA1581 ("For the avoidance of doubt, holders of Claims or Interests in Classes that are deemed to reject the Plan and therefore are not entitled to vote under the Plan are not Releasing Parties in their capacities as holders of such Claims or Interests."). In no event were Releasing Parties' recoveries under the Plan tied to their election to opt-out or not; they received the same distributions in either event. See JA1591-1602.

The Plan also carefully limited the claims covered by the Third-Party Releases, mandating that they have a connection to GOL or its bankruptcy. Specifically, the Plan only provided for the release of claims "based on or relating to, or in any manner arising from, in whole or in part, the Debtors" and events occurring during the pendency of GOL's bankruptcy. JA1643.

GOL revised and supplemented the Plan multiple times, as is common in complex chapter 11 cases like this one. See JA1818. But the Third-Party Releases stayed in place for months throughout each and every amendment. JA4; see also JA140-141; JA155-156; JA191-192; JA210-211; JA263-265; JA727-723; JA734-735; JA1376-1377; JA1511-1512.

13

B.      In March 2025, the Bankruptcy Court approved the adequacy of GOL's disclosure statement, which (among other things) explained and prominently disclosed the Third-Party Releases—and creditors' ability to opt out of those releases—to all of GOL's creditors.  JA487-496.  The Bankruptcy Court also authorized GOL to distribute the disclosure statement, Plan, and ballots to all creditors entitled to vote on the Plan.[4] The creditors who were not entitled to vote on the Plan—either because their claims were unimpaired and they were conclusively deemed to accept the Plan, 11 U.S.C. 1126(f), or because they received no property under the Plan and therefore were conclusively deemed to reject it, 11 U.S.C. 1126(g)—received a notice of non-voting status instead of a ballot. JA1495.

The very first page of the ballot and notice sent to *all* of the Releasing Parties stated that "unless you take *additional action* as

---

[4]      In lieu of requiring certain Brazilian litigation claimants to file individual proofs of claim—which would have been burdensome—GOL stipulated that those claimants would not have to file proofs of claim and instead would hold allowed claims treated under the Plan (specifically, in Class 9).  Order, *GOL Linhas Aereas Inteligentes S.A.& Gol Fin. (Lux.)*, No. 1:24-bk-10118 (Bankr. S.D.N.Y. June 6, 2024) ("Bankr. Dkt."), Dkt. No. 691; JA1838.  The Plan did not impair these Class 9 creditors; their claims were unaffected by the Plan.  JA1855.

described herein and *affirmatively opt out* of the Third-Party Release, you will be deemed to release claims you may have against certain non-Debtors." JA6.

At the conclusion of the voting period, 15 of the 16 voting classes voted to accept the Plan. JA1843. Additionally, creditors returned over 350 opt-outs from the Third-Party Releases across all ballots.[5] JA1844-1845.

## III. PROCEDURAL HISTORY

A. GOL proceeded to confirmation of the Plan in May 2025. The Plan enjoyed wide support from GOL's stakeholders, including the Official Committee of Unsecured Creditors (the estate fiduciary charged with protecting the interests of many of the Releasing Parties) and GOL's largest secured and unsecured creditors. JA1846.

The Trustee, however, objected. As most relevant here, the Trustee objected to the Plan's inclusion of the Third-Party Releases on the basis

---

[5] Voting creditors received one of two types of ballots: regular ballots and master ballots. The regular ballots were sent to creditors who voted on their own behalf, while master ballots were sent to nominees or record holders of claims (like indenture trustees of GOL's funded debt) who collected voting elections from the beneficial holders of those claims and then filled out the master ballots to reflect their clients' votes and opt-out decisions. JA1844 n.12.

15

that they were not consensual. JA1350. The Trustee argued that GOL's use of opt-out procedures did not manifest creditors' consent to the Third-Party Releases, making them impermissible under 11 U.S.C. 1123(b)(6) and the Supreme Court's decision in *Purdue*. See JA1359-1361. No party to the bankruptcy—none of the myriad creditors—joined or supported the Trustee's objection.

B.   In a 57-page opinion, the Bankruptcy Court rejected the Trustee's arguments across the board. It first held that the question of whether a creditor consents to a third-party release is a question of federal, not state, law. JA1850-1860. It then held that opt-out procedures—like those used by GOL in this case—satisfy the federal standard for consent. JA1868-1870. The Bankruptcy Court therefore overruled the Trustee's objection and confirmed the Plan. JA1870-1871.

The Trustee promptly appealed the Bankruptcy Court's decision and moved for a stay pending appeal to prevent the Plan from becoming effective. JA926; JA1873. Once more the Trustee acted alone; not one party supported the appeal.

After entering a brief administrative stay and holding a hearing on the Trustee's motion, the District Court denied the Trustee's stay

16

request. JA10. Accordingly, the Plan became effective on June 6, 2025. Bankr. Dkt. No. 1741 (June 6, 2025).

C. On December 1, 2025, the District Court (Cote, J.) issued its opinion and order striking the Third-Party Releases and related injunction from the Plan. JA1; *In Re Gol Linhas Aéreas Inteligentes S.A.*, 675 B.R. 125 (S.D.N.Y. 2025). The Court held that "it [wa]s not necessary to decide whether federal or state law controls" whether a release is consensual under Section 1123(b)(6) because "the same general principles of contract law apply under both federal and state law, so there is no conflict." JA12. The Court then found that, under contract law principles, "the third-party releases at issue here are nonconsensual and, thus, barred by the Supreme Court in *Purdue.*" JA12.

In reaching this conclusion, the District Court assumed without analysis that New York contract law governed consent to provisions included in the Plan. JA12-13. The Court then found that the opt-out procedures used by GOL did not establish consent under New York law because "silence constitutes assent only in particular circumstances, such as where there is a duty to respond or where there is a contemporaneous oral agreement." JA13 (quoting *Schnabel* v. *Trilegiant Corp.*, 697 F.3d

17

110, 128 (2d Cir. 2012)). In the District Court's view, GOL's "creditors had no duty to respond to the opt-out opportunity" and no party "claim[ed] that any contemporaneous oral agreement was made," rendering the Third-Party Releases nonconsensual under state law. JA13.

The District Court then stated that if federal law applies, it should be the "federal common law of contract," meaning "general principles of contract law." JA15 (quoting *Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, NA*, 747 F.3d 44, 49 (2d Cir. 2014)). The Court found those principles were essentially the same as the ones applied under New York law. JA14-15. The Court therefore determined the releases were nonconsensual as a matter of federal law, too. JA14-15.

## STANDARD OF REVIEW

Whether the Bankruptcy Code authorizes the inclusion of opt-out third-party releases in a bankruptcy plan is a legal question this Court reviews de novo. *In re Motors Liquidation Co.*, 943 F.3d 125, 129 (2d Cir. 2019).

18

## SUMMARY OF ARGUMENT

I.    The Bankruptcy Code authorizes the inclusion of a provision in a bankruptcy plan that releases claims against certain creditors, while permitting the releasing parties to opt out.

A.    That conclusion flows directly from the text of Section 1123(b)(6) and the Supreme Court's decisions in *United States* v. *Energy Resources Co.*, 495 U.S. 545 (1990), and *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024).  Taken together, those cases establish that a bankruptcy plan "may" provide for opt-out third-party releases "if the bankruptcy court determines that [they are] necessary to the success of a reorganization plan," *Energy Res.*, 495 U.S. at 549, "similar in nature" to the kinds of plan provisions specifically described in Section 1123, *Purdue*, 603 U.S. at 217-218 (citation omitted), and "not inconsistent" with the other provisions of the Bankruptcy Code, 11 U.S.C. 1123(b)(6).

B.    Opt-out third-party release provisions readily satisfy these requirements.  They are necessary to the success of a plan where—as here—the releases are provided to induce the releasing creditors to make valuable contributions or concessions to facilitate the reorganization. Opt-out third-party release provisions are also "similar in nature" to the

19

kinds of plan provisions specifically enumerated in the Bankruptcy Code: Several subsections of Section 1123 contemplate that a creditor may consent to the relinquishment of its rights, and courts have routinely held that the requisite consent is supplied by a creditor's choice to remain silent after being put on notice that its rights will be affected if it does not speak up.

C.    Opt-out consent provisions are also consistent with the numerous other provisions of the Bankruptcy Code that expressly permit creditors to consent to relinquish their rights in a bankruptcy proceeding. 28 U.S.C. 157(c); see also, *e.g.*, 11 U.S.C. 363(f)(2), 1123(a)(4), 1126(c), 1129(a)(9).    In interpreting and applying those provisions, too, courts have held that a creditor gives its "implied consent" when it is put on notice that its rights will be relinquished unless it asserts them and nonetheless stays silent. *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U.S. 665, 684-685 (2015).   That makes sense because creditors in a bankruptcy case are litigants in a federal proceeding, and litigants are generally assumed to consent to whatever is happening in the proceeding—from the introduction of evidence to the submission of jury instructions— where they do not speak out.

20

D. Recognizing that opt-out procedures are sufficient to show consent is also consistent with the basic rule in the class action context, where the Supreme Court has found opt-out consent sufficient. *Phillips Petrol. Co.* v. *Shutts*, 472 U.S. 797, 811-814 (1985). Like class actions, bankruptcy proceedings are a form of collective action (and a mandatory one at that). It would be illogical to conclude that opt-out consent is sufficient to establish that an absent class member has agreed to have its claims resolved in a class action, but that opt-out consent is *not* sufficient to show that a creditor has voluntarily released its claims under a bankruptcy plan.

II. The Trustee agrees that consensual third-party release provisions may be included in a bankruptcy plan. It could hardly do otherwise because this Court held as much in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), and *Purdue* expressly stated that it did not "call into question" the validity of consensual releases, 603 U.S. at 226. The Trustee asserts, however, that courts should apply state contract law in assessing whether the opt-out procedures are sufficient to show consent, and contract law bars opt-out consent. That is wrong many times over.

21

A.      Courts have consistently applied federal, not state, law in assessing whether a creditor has consented to relinquish its rights in a bankruptcy proceeding.  The Trustee's argument that state law should instead apply rests on the principle that state law defines the *substance* of a creditor's claims when it enters bankruptcy.  That is of course true, but it is equally true that federal bankruptcy law controls whether and how those state law rights may be altered or abridged within the Bankruptcy Code's mandatory collective action regime—including how a creditor may voluntarily relinquish those rights in a bankruptcy plan.  In any event, the question of what procedures are necessary to establish consent to a release is procedural, and it is black letter law that federal courts apply federal procedural law.  That is why Federal Rule of Civil Procedure 23(c) governs the consent procedures for federal class actions.

B.      The Trustee nonetheless asserts that state contract law should apply, arguing that consensual releases are merely a form of contract.  The District Court accepted that argument, but it is flat wrong.  Contract law does not apply because a bankruptcy plan is *not* a contract; it is a formal, court-approved document establishing how a company will reorganize in conformity with the federal laws of bankruptcy.  Unlike a

22

standard contract, its contents are controlled by federal law, and it cannot take effect until a federal court approves it.

Federal bankruptcy courts therefore rigorously scrutinize every third-party release provision to ensure not just that the releases are consensual and otherwise in conformity with the requirements of Section 1123(b)(6), but also that they are in the creditors' best interest and that they have been proposed in "good faith." 11 U.S.C. 1129(a)(3), (7). State contract law simply has nothing to say about what constitutes consent in this context. Nor can the Trustee rescue its argument by relying on a few cases that have looked to state law to resolve different questions concerning the validity of settlement agreements, which *are* contracts.

C.    In any event, even if state (or federal) contract law somehow applies, the opt-out procedures in this case are sufficient to satisfy the requirements for consent under contract law. The Restatement of Contracts makes clear that silence may constitute consent when a party receives something of value under a contract with knowledge that consideration is expected in return, and when a party is on notice that its silence will be interpreted as consent. Those principles apply here, where every releasing creditor received something of value under the Plan—

23

either payment on its claims or preservation of their full value—and where these creditors were on notice that if they wished to reject the releases, they needed to opt out.

D.     The Trustee's remaining arguments lack merit.  The Trustee hints (but does not actually argue) that the notice procedures here were inadequate.  But the procedures used in this case are the same ones that have been used to notify creditors of their right to vote on a bankruptcy plan for decades, and they are at least as robust as those routinely used to notify absent class members of their rights under Federal Rule of Civil Procedure 23.  The Trustee's specific arguments regarding subsets of the releasing parties, such as non-voting creditors, also fail because they are neither properly presented nor meritorious.  In the Bankruptcy Court, the Trustee asserted that opt-out third-party releases are *never* permissible.  Therefore, to reject the Trustee's argument, it is enough for this Court to hold that Section 1123(b)(6) authorizes the inclusion of opt-out releases in a bankruptcy plan.

E.     Finally, it is worth noting that the Trustee is alone in objecting to the Third-Party Releases in this case.  The actual parties to the bankruptcy whose rights the Trustee purports to be defending have

24

not raised any concerns.  Further, the overwhelming majority of courts to consider the question have held that opt-out third-party release provisions are permitted by the Bankruptcy Code and vital to the success of many of the largest reorganizations that occur under the Bankruptcy Code.  This Court should reach the same conclusion and reverse.

## ARGUMENT

### I.    SECTION 1123(b)(6) AUTHORIZES THE INCLUSION OF OPT-OUT THIRD-PARTY RELEASES IN A BANKRUPTCY PLAN.

The Bankruptcy Code authorizes the inclusion of a provision in a bankruptcy plan that releases claims against certain creditors while permitting the releasing parties to opt out.  The plain text of Section 1123(b) sets out various provisions that a bankruptcy plan "may" include and then finishes with a residual clause authorizing "any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. 1123(b)(6).  The ordinary meaning of that language readily authorizes creditor releases that are included in a plan to induce the released creditors to make valuable contributions to a bankruptcy case.  And so long as the releasing creditors are given an opportunity to opt out, such releases are "not inconsistent with the applicable

25

provisions" of the Bankruptcy Code, which contains numerous provisions allowing creditors to consent to relinquish their rights.

That conclusion is confirmed by the Supreme Court's decisions in *United States* v. *Energy Resources Co.*, 495 U.S. 545 (1990), and *Harrington* v. *Purdue Pharma L.P.*, 603 U.S. 204 (2024), which establish the requirements for satisfying Section 1123(b)(6). Under those decisions, a plan may include a provision if it is necessary to the success of the reorganization, similar to the plan provisions expressly contemplated in Section 1123, and consistent with the remainder of the Bankruptcy Code. Opt-out third-party release provisions readily satisfy each of those requirements, and their validity is confirmed by the use of opt-out consent in the analogous class action context.

## A. *Energy Resources* And *Purdue* Establish The Requirements For A Bankruptcy Plan Provision Under Section 1123(b)(6).

The Supreme Court's decisions in *Energy Resources* and *Purdue* establish the contours of Section 1123's residual clause.

1. Start with *Energy Resources*, which held that this residual clause authorized a bankruptcy plan term that required one creditor to apply its debt repayments in a way that would benefit another creditor.

26

495 U.S. at 549. In that case, the debtor was a company with numerous unpaid tax bills from the IRS. *Id.* at 547. One of the tax debts involved a special kind of "trust fund" tax that can be collected from a company's officers if the company fails to pay. *Ibid.* An officer of the debtor company agreed to provide additional funds for the estate in exchange for a provision in the bankruptcy plan guaranteeing that the company's tax repayments would be applied to the company's "trust fund" tax before they were applied to any other tax debt. See *id.* at 546-549; *In re Energy Res. Co., Inc.*, 59 B.R. 702, 703-704 (Bankr. D. Mass. 1986). That provision benefited the officer (who was also a creditor) by increasing the chances that the company would fully repay the trust-fund tax debt so the officer would not have to assume it. But—when it came time to enforce the plan provision—the IRS refused, asserting that the bankruptcy court had exceeded its authority by approving and enforcing the plan term. *Energy Res.*, 495 U.S. at 547-548. The Supreme Court disagreed. *Id.* at 549.

The Supreme Court held that "a bankruptcy court has the authority" to approve and enforce a plan provision requiring the IRS to apply tax repayments in a specific manner "if the bankruptcy court

27

determines that this designation is necessary to the success of a reorganization plan." *Energy Res.*, 495 U.S. at 549. The Court explained that, while the "Code does not explicitly authorize the bankruptcy courts to approve" this kind of plan term, the requisite authority comes from the "residual" clause of Section 1123(b), which authorizes the inclusion of "any * * * appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code. *Ibid.* The Court further observed that, under 11 U.S.C. 105(a), bankruptcy courts have the power to issue orders "necessary or appropriate to carry out" the provisions of the Bankruptcy Code, and these "directives are consistent with the traditional understanding that bankruptcy courts * * * have broad authority to modify creditor-debtor relationships." *Ibid.*

2. In *Purdue*, the Supreme Court clarified that a bankruptcy court's broad authority to approve plan terms "necessary to the success of a reorganization plan" is not limitless. *Energy Res.*, 495 U.S. at 549. *Purdue* held that Section 1123(b)(6) does not authorize the inclusion of plan terms that extinguish claims against a nondebtor "*without the consent of the affected claimants.*" 603 U.S. at 216 (emphasis added).

28

In reaching that conclusion, the Court first explained that Section 1123(b)(6) limits plan provisions to those that are "appropriate," a term that—under the *ejusdem generis* canon—restricts the reach of the residual clause to provisions that are "similar in nature" to those expressly contemplated in the Bankruptcy Code. *Id.* at 217-218 (citation modified). The Court then observed that Section 1123(b) lists "five specific sorts of provisions" a plan "may" include before Section 1123(b)(6)'s residual clause, and the "obvious link" is that the enumerated provisions all "concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* at 218. Citing *Energy Resources*, the Court explained it was "[d]oubtless" that Section 1123(b)(6) "operates to confer additional authorities on a bankruptcy court." *Ibid.* But the Court determined that the catch-all could not be stretched to give bankruptcy courts the "'radically different' power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants." *Ibid.* (citation omitted). The Court noted, for example, that each of Section 1123(b)'s other "paragraphs authorizes a bankruptcy court to adjust claims *without consent* only to the extent such claims concern the debtor." *Id.* at 218-219 (emphasis added).

29

*Purdue* also found that allowing a bankruptcy court to extinguish claims against a nondebtor involuntarily would be "inconsistent with the applicable provisions of" the Bankruptcy Code that reserve the benefit of a compelled discharge purely for a debtor that places all its assets on the table. 603 U.S. at 221-222. And the Court noted that another provision of the Bankruptcy Code, 11 U.S.C. 524(g)(4)(A)(ii), specifically authorizes a bankruptcy court to "enjoin claims against third parties without their consent," but only in the context of "asbestos-related bankruptcies," suggesting that bankruptcy courts lack the power to compel nonconsensual releases in other contexts. *Id.* at 222.

*Purdue* took care to emphasize, however, that its holding should not "be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan," observing that "those sorts of releases pose different questions and may rest on different legal grounds than" nonconsensual releases. 603 U.S. at 226. Moreover, the Court's reasoning relied heavily on the fact that permitting nonconsensual releases would expand the scope of the traditional bankruptcy discharge by forcing parties to relinquish claims against

30

someone other than the debtor. That logic simply does not apply to consensual releases. *Ibid.*

3. Taken together, *Energy Resources* and *Purdue* establish that Section 1123(b)(6) authorizes a bankruptcy court to approve and enforce a plan provision where the court finds it "necessary to the success of a reorganization plan," *Energy Res.*, 495 U.S. at 549, and where the provision is "similar in nature" to the types of plan provisions that Section 1123 expressly authorizes, *Purdue*, 603 U.S. at 217-218 (citation omitted). Further, the cases emphasize that a bankruptcy court must carefully scrutinize other parts of the Bankruptcy Code to ensure they are "not inconsistent" with the proposed plan provision. 11 U.S.C. 1123(b)(6); see *Energy Res.*, 495 U.S. at 550-551; *Purdue*, 603 U.S. at 221-223.

**B.      Opt-Out Third-Party Release Provisions Satisfy The Requirements Established In *Energy Resources* and *Purdue.***

Under these principles, a bankruptcy court may approve and enforce a plan provision that releases claims against certain creditors while providing the releasing parties with an opportunity to opt out.

31

### 1. Opt-out releases are often "necessary" to a successful reorganization.

A plan provision calling for third-party releases with opt-out consent will often be "necessary to the success of a reorganization plan" because—in many instances—parties are only willing to make substantial economic contributions to a reorganization in exchange for the finality a third-party release brings.

In this case, for example, the Plan calls for certain Released Parties to take equity in satisfaction of their secured claims. See, *e.g.*, JA1560 ("Abra Equity Distribution" definition); JA1592. GOL's secured creditors were not obligated to do this; they could have insisted that the Plan preserve their debt claims, see 11 U.S.C. 1129(b)(2)(A), but their agreement to accept equity instead enabled other creditors to receive value that otherwise would have been unavailable for them. These secured creditors reasonably insisted, however, that other creditors should be asked to voluntarily relinquish some of their own rights—in the form of the release of claims.

Consensual third-party releases may therefore be "necessary to the success of a reorganization plan" in the same way as the plan provision in *Energy Resources*. Both contemplate compromising the rights of one

32

creditor (in *Energy Resources*, the IRS; here, the releasing creditors) to benefit another (in *Energy Resources*, the company officer; here, the released creditors), all with the intent of inducing the benefited party to make contributions that are vital to the success of the reorganization.

### 2. Opt-out releases are "similar in nature" to the plan provisions Section 1123 expressly enumerates.

Unlike the nonconsensual release provisions in *Purdue*, opt-out release provisions are also "similar in nature" to the kinds of plan provisions specifically enumerated in Section 1123(b)(1) through (5)— which often involve a creditor's *consensual* relinquishment of property rights the Bankruptcy Code would otherwise preserve. For example, Section 1123(b)(4) permits plan provisions that require the "sale of all or substantially all of the property of the estate," but Section 363(f) tightly restricts a trustee's ability to sell estate property "free and clear" where another entity has a secured lien on the property that would be extinguished in the sale. As a result, the sale provisions of bankruptcy plans permitted by Section 1123(b)(4) often rely on Section 363(f)(2), which permits a free-and-clear sale where "such entity consents." And courts consistently have held that a creditor's "lack of objection (provided

33

of course there is notice) counts as consent." *FutureSource LLC* v. *Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (Posner, J.); accord *In re TE Holdcorp LLC*, 2023 WL 418059, at \*3 (3d Cir. Jan. 26, 2023); *In re Colarusso*, 295 B.R. 166, 175 (1st Cir. BAP 2003); *In re Borders Grp., Inc.*, 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) ("Under section 363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear of liens."). Opt-out third-party release provisions are well in keeping with this enumerated type of sale provision.

Further support comes from Section 1123(a). While Section 1123(*b*) establishes what a plan "may" permit, Section 1123(*a*) specifies what the plan "shall" do. Notably, that provision also contemplates that a plan may involve the relinquishment of a creditor's protected rights, so long as the creditor consents.

Section 1123(a)(4) mandates "the same treatment for each claim or interest of a particular class, *unless the holder of a particular claim or interest agrees to a less favorable treatment.*" (emphasis added). The italicized language allows a creditor to consent to a diminishment of its

rights vis-à-vis similarly situated creditors where, for example, it believes that accepting differential treatment will ensure the success of the reorganization as a whole. That is directly analogous to opt-out third-party release provisions, which permit a creditor to agree to give up its claims against other creditors in the interest of a successful reorganization. And courts interpreting Section 1123(a)(4) have held that a creditor's failure to object to its intra-class treatment constitutes "agreement," *i.e.*, consent, to the plan's treatment of the claim or interest. *E.g. In re Hopeman Bros., Inc.*, 2025 WL 3688940, at \*18 (Bankr. E.D. Va. Oct. 31, 2025) (deeming Section 1123(a)(4) satisfied by agreement where no creditor in the relevant class "objected to the Plan").

Because opt-out release provisions are "similar in nature" to the bankruptcy plan provisions expressly contemplated by both Section 1123(a) and (b), such release provisions satisfy *Purdue*'s definition of "appropriate."

> **3. Opt-out releases are consistent with the numerous Bankruptcy Code provisions permitting creditors to give implied consent to the relinquishment of their rights.**

Opt-out third-party release provisions also satisfy Section 1123(b)(6)'s requirement that a plan provision cannot be "inconsistent"

35

with the remainder of the Bankruptcy Code. The Bankruptcy Code is devoid of directives that might conflict with a provision calling for consensual third-party releases. To the contrary, the Bankruptcy Code repeatedly contemplates that parties to a bankruptcy proceeding may consent to the relinquishment of their rights to facilitate a reorganization, and courts have repeatedly found that this consent may be expressed implicitly through a party's failure to object after receiving adequate notice.

Most notably, Section 157(c)(2) provides that a bankruptcy court can adjudicate non-core proceedings only "with the consent of all the parties to the proceeding." In *Wellness International Network, Ltd.* v. *Sharif*, 575 U.S. 665 (2015), the Supreme Court held that "implied consent" is sufficient. *Id.* at 684. Indeed, the Court specifically rejected the contention that when a litigant "consent[s] to adjudication" of its claims "by a bankruptcy court, such consent must be express." *Id.* at 683. The Court explained that "[n]othing in the Constitution" or the "relevant statute, 28 U.S.C. § 157, mandate[s] express consent." *Ibid.* The Court further observed that it had already held in another context that a litigant implicitly consents to the adjudication of its claims where "the

36

litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case." *Id.* at 685 (quoting *Roell* v. *Withrow*, 538 U.S. 580, 590 (2003)).

*Wellness* and the consent-adjudication provision it interpreted demonstrate that a party may implicitly consent to give up rights related to claims that would otherwise be litigated outside the bankruptcy. While Section 157 concerns the relinquishment of a party's right to adjudicate those claims in an Article III court, and third-party releases involve relinquishing the claims altogether, the same basic logic holds: A creditor may consent to give up rights in a litigation that would otherwise be preserved, and there is no requirement that the consent be explicit. It is enough for the creditor to know about the need for consent and its right to refuse, and to lodge no objection despite that knowledge.

Nor is *Wellness* the only case that recognizes that a party to a bankruptcy proceeding may give implicit consent to relinquish its rights where the party is on notice that its rights may be extinguished and fails to take affirmative steps to object. As noted, courts have held that the consent requirements in Sections 363(f)(2) and 1123(a)(4) are satisfied by notice and a failure to object. See pp. 33-35, *supra.*

37

Other examples abound. Section 1126(c) governs whether a "class of claims has accepted a plan," providing that a class is deemed to accept a plan "if such plan has been accepted by creditors" holding a majority in number and two-thirds in value of the class vote in favor of the plan. When creditors have not cast a vote, the courts of appeals have concluded that inaction constitutes acceptance of the plan. *E.g. In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir. 1988) ("We hold that the district court correctly affirmed the bankruptcy court's ruling that [the creditor's] inaction constituted an acceptance of the Plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 261 (Bankr. S.D.N.Y. 2007) (similar). And the same goes for acceptance of a chapter 13 plan. *In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989) ("The general rule is that the acceptance of the plan by a secured creditor can be inferred by the absence of an objection."); *In re Harvey*, 213 F.3d 318, 322 (7th Cir. 2000) (similar); *Shaw* v. *Aurgroup Fin. Credit Union*, 552 F.3d 447, 457 (6th Cir. 2009) ("[I]f a secured creditor fails to object to confirmation, the creditor will be bound by the confirmed plan's treatment of its secured claim under § 1325(a)(5). This is because the failure to object constitutes acceptance of the plan."); *In re Andrews*, 49 F.3d 1404, 1409 (9th Cir.

38

1995) ("In most instances, failure to object translates into acceptance of the plan by the secured creditor.").

Similarly, Section 1129(a)(9) prescribes priority treatment of certain claims "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim." With this provision, too, courts have held that a creditor's failure to object to the treatment of its priority claim establishes the creditor's consent to the plan's proposed treatment of that claim. *E.g. In re Teligent, Inc.*, 282 B.R. 765, 771-773 (Bankr. S.D.N.Y. 2002); see also *In re Facciponte*, 1992 WL 722289, at *1-2 (Bankr. N.D.N.Y. 1992) (construing the materially identical provision in 11 U.S.C. 1322(a)(2), holding that "[h]aving remained silent, however, [the creditor] has agreed to the treatment of its claim as set forth in Debtor's Plan").

These holdings make sense. Creditors in a bankruptcy case are parties to a judicial action. *Langenkamp* v. *Culp*, 498 U.S. 42, 44 (1990) (per curiam). Basic principles of waiver and forfeiture dictate that, when litigants are on notice that an aspect of a judicial proceeding may infringe their rights, they must take steps to assert them; if they stay silent, the court may interpret that silence as consent. This principle plays out most

39

drastically in the context of a default judgment, which may be entered against litigants who fail to respond after receiving adequate notice of a lawsuit against them. Fed. R. Civ. P. 55. But it also plays out on a much smaller scale in civil and criminal proceedings every day.

If a defendant says nothing when the other side introduces a piece of evidence or proposes a particular jury instruction, the defendant is deemed to consent to that evidence or instruction even though the defendant has not explicitly said anything. See *Luria Bros & Co.* v. *All. Assurance Co.*, 780 F.2d 1082, 1089 (2d Cir. 1986) ("[C]onsent may be implied from failure to object at trial to the introduction of evidence relevant to the unpled issue."). That is because parties to a judicial proceeding have an obligation to monitor its progress and assert their rights. See *Perfect Fit Indus., Inc.* v. *Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981).

So too in a bankruptcy case. When a creditor or any other party is on notice that its rights may be compromised, its silence may reasonably be treated as consent. The opt-out consent procedures in this case, for example, required the creditors to be notified of the release, their right to opt out, and the consequences of a failure to opt out. Having received

40

such notice, creditors are "not entitled to stick [their] head[s] in the sand and pretend [they] would not lose any rights by not participating in the proceedings." *In re Pence*, 905 F.2d 1107, 1109 (7th Cir. 1990).

To be sure, some courts have held that the Bankruptcy Code requires express consent in certain circumstances. See, *e.g.*, *In re Roberts*, 249 B.R. 152, 157 (Bankr. W.D. Mich. 2000) (recognizing the weight of authority supports implied consent under Section 363(f)(2), but "choos[ing] not to follow these authorities"); *In re DeCelis*, 349 B.R. 465, 469 (Bankr. E.D. Va. 2006) (similar); *In re Digit. Impact, Inc.*, 223 B.R. 1, 7 (Bankr. N.D. Okla. 1998) (similar with respect to Section 1129(a)(9)). But virtually all of these cases predate the Supreme Court's decision in *Wellness International*, which makes clear that, in the bankruptcy context, "implied consent" is generally sufficient. 575 U.S. at 683-684. And even if there are some instances where that general rule does not hold, it certainly applies where—as here—creditors are expressly notified of their rights and given ample opportunity to opt out.

## C. The Use of Opt-Out Consent In Class Actions Supports The Validity Of Opt-Out Release Provisions.

The proposition that opt-out procedures are sufficient to establish consent in the bankruptcy context also accords with the principles

underlying class actions. Like class actions, bankruptcy proceedings are a form of collective action established by federal law—and a mandatory one at that, because all creditors are required to participate to vindicate their rights against the debtor. Both the Federal Rules of Civil Procedure and the Supreme Court's cases addressing class actions recognize that opt-out consent is sufficient to protect the rights of absent parties when their claims are adjudicated—and often settled—on a class basis. See *Phillips Petrol. Co.* v. *Shutts*, 472 U.S. 797, 811-814 (1985).

*Shutts* explained that, even though a party must usually consent to have its rights adjudicated in a forum that lacks personal jurisdiction over it, in the class action context, an absent class member's consent can be implied by its failure to opt out after receiving adequate notice of the class proceeding. 472 U.S. at 811-814. And *Shutts* held as much even though an absent class member may have no idea that the class action is occurring, and thus no reason to monitor its mail for notice or to attend to the opt-out instructions in any notices it receives. It would be illogical to find that opt-out procedures are sufficient to bind absent members to the adjudication of their claims—which may include the release of claims through a class settlement—while simultaneously concluding that opt-

42

out procedures are insufficient to consent to releases in a bankruptcy case—particularly because, in this case at least, the releases were limited to creditors who had filed a proof of claim or otherwise held allowed claims in the bankruptcy and therefore knew very well that the proceeding was occurring. See JA1829-1831.

## II. THE TRUSTEE'S ARGUMENTS TO THE CONTRARY ARE WRONG.

The Trustee does not dispute that a bankruptcy plan may include a consensual third-party release provision. The Trustee could hardly argue otherwise because this Court has expressly recognized that the Bankruptcy Code authorizes third-party releases "if the affected creditors consent." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Because *Purdue* explained that it did not "call into question" the validity of consensual releases, 603 U.S. at 226, *Metromedia* is still binding circuit precedent.

The Trustee argues, however, that whether a release is consensual is a question of state contract law, and the applicable state contract law does not permit opt-out consent. That is wrong at every turn. State law does not apply; contract law does not apply; and, even if it did, contract law *does* permit opt-out consent in these circumstances.

43

### A. Federal Bankruptcy Law Governs The Question Of Whether Opt-Out Consent Is Permissible.

As the numerous cases cited in Part I demonstrate, federal courts routinely apply federal law in assessing whether a creditor has consented to relinquish its rights in a bankruptcy case. The Bankruptcy Code establishes a uniform system of federal law governing whether and how a creditor's rights can be modified in a bankruptcy proceeding. *E. Equip. & Servs. Corp.* v. *Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001) (per curiam) ("The United States Bankruptcy Code provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights."). It would therefore be anomalous—and contrary to the uniformity principles for bankruptcy enshrined in the Constitution itself, U.S. Const. art. I § 8 cl. 4—if the law of fifty different states governed the process through which a creditor may consent to the release of its rights in a bankruptcy plan.

The Trustee insists, however, that because "state law governs the substance of claims" in a bankruptcy, it must also govern questions regarding how those claims may be relinquished in a bankruptcy. Trustee Br. 29, D. Ct. Dkt. No. 42 (quoting *Travelers Cas. & Sur. Co. of Am.* v. *Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007)). That is incorrect.

44

It is of course true that the scope of a creditor's property rights at the outset of a bankruptcy is defined by state law, but *federal* law determines the extent to which those rights are preserved, adjusted, or abridged throughout the bankruptcy proceedings. Some Bankruptcy Code provisions protect those rights, see, *e.g.*, 11 U.S.C. 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); some allow for their diminution or alteration, see, *e.g.*, 11 U.S.C. 502(b) (prohibiting allowance of various property interests), and some—including Section 1123(b)(6)—allow the creditor to consent to their alteration or elimination, see, *e.g.*, 11 U.S.C. 363(f)(2); 11 U.S.C. 1123(a)(4); 28 U.S.C. 157(c). All of these provisions governing how state property rights may be affected by a federal bankruptcy case are interpreted and applied in accordance with federal, not state, law.

Further, the Trustee's observation that state law governs the *substance* of claims ignores that the question of what procedures are necessary to secure a creditor's consent to release its claims in a bankruptcy plan is fundamentally *procedural*. Were it otherwise, Federal Rule of Civil Procedure 23(c) could not establish the procedures

45

for obtaining absent class members' consent to the adjudication of their rights in a class action. See *Shady Grove Orthopedic Assocs., P.A.* v. *Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (recognizing that federal rules governing class actions are procedural). It is black letter law that even when federal courts are required to apply state substantive law, federal procedural law governs. See *Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64, 92 (1938); *Hanna* v. *Plumer*, 380 U.S. 460, 465 (1965).

### B.  Contract Law Does Not Apply.

The Trustee nonetheless asserts that courts should look to state contract law in assessing the validity of a third-party release in a bankruptcy plan. The District Court perpetuated this error by holding that, regardless of whether state or federal law applies, contract law principles govern. JA12. That fundamentally misunderstands the nature of a bankruptcy plan, which is *not* a contract. See, *e.g.*, *In re Frontier Ins. Grp., Inc.*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019).

A bankruptcy plan is a formal document that establishes how a debtor will reorganize its affairs and discharge its debts in a manner that complies with federal bankruptcy law. See 11 U.S.C. 1141. Unlike a

contract, the contents of a bankruptcy plan are strictly controlled by federal law, which dictates the kind of provisions the plan "shall" and "may" include. 11 U.S.C. 1123(a)-(b). And unlike a standard contract, a bankruptcy plan must be approved by a federal court that is charged with ensuring the plan complies with federal law and satisfies prescribed statutory criteria—including that the plan complies with the Bankruptcy Code, is "proposed in good faith," is in the best interests of creditors, and is not likely to be followed by a "liquidation, or the need for further financial reorganization." 11 U.S.C. 1129(a)(1), (3), (7), (11). And once confirmed, a plan binds all creditors with notice of the case regardless of whether they participated in the case or voted on the plan. 11 U.S.C. 1141(a).

1. These distinctions between a contract and a bankruptcy plan have real practical effect when it comes to third-party releases. Individuals and entities often enter into contracts that release claims. To do so, the parties typically agree on terms and sign a document indicating as much, which renders the release enforceable so long as both sides entered into it knowingly and voluntarily. But including a release in a bankruptcy plan is not nearly so simple. To be included in the plan, the

release must conform with Section 1123(b)(6)'s requirements—that is, it must be necessary to the success of the reorganization, similar in nature to the kinds of provisions expressly enumerated in Section 1123, and consistent with the provisions of the Bankruptcy Code as a whole. Even then, Section 1129 bars a court from approving a third-party release provision until it has ensured that the plan is, among other things, in the best interest of the creditors and proposed in good faith. If the court concludes otherwise, the release provision will not be approved or enforced, regardless of the parties' preferences.[6]

Moreover, courts typically take their duty to scrutinize plan provisions very seriously. In this case, for example, the Bankruptcy Court made detailed findings establishing not just that the Third-Party

---

[6] Because of the numerous limits on what a bankruptcy plan may contain and when the Bankruptcy Court may approve a plan, the Trustee is also wrong to suggest that permitting opt-out third-party release provisions will lead to the inclusion of all manner of improper plan provisions. The Trustee asserts, for example, that a plan might include a provision calling for creditors to "make a $100 contribution to the college education fund for the children of the CEO of the debtor" unless the creditors "check an 'opt out' box on a ballot." Trustee Br. 41-42, D. Ct. Dkt. No. 42 (quoting *In re Smallhold, Inc.*, 665 B.R. 704, 710 (Bankr. D. Del. 2024)). That plan provision would plainly violate the requirements of Section 1123(b)(6) and the standard for plan approval in Section 1129, among other things.

Releases were consensual because creditors had adequate notice and an opportunity to opt out, JA1868-1870, but also that the releases are "an essential, integral, and non-severable component[] of the Plan * * * and resolution of the Chapter 11 Cases." JA1537. The Court further found that the release provision is "appropriately and narrowly tailored," that it "confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors," and that it "is supported by good and valuable consideration (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan)." JA1537.

2.    By contrast, a court typically plays no role in the formation and approval of a standard contract, nor are the contents and enforceability of a standard contract governed by federal law. State contract law is therefore an exceedingly poor fit for analyzing questions of consent with respect to releases in a bankruptcy plan provision.

Indeed, even if it were necessary to look outside federal bankruptcy law, the far more obvious analogy is to class actions, where—as here—a court is charged with overseeing the proceedings and ensuring that absent class members' interests are adequately protected. The District

49

Court rejected the class action analogy on the ground that there was "no suggestion that the releasing parties * * * are members of a defined class * * * or that the Rule 23 procedures and its safeguards have been followed." JA16. But that misses the point. GOL is not suggesting that the bankruptcy proceeding is somehow governed by Federal Rule of Civil Procedure 23. It is observing that a bankruptcy proceeding bears strong similarities to a class action—including because of the extensive procedural safeguards and judicial oversight the Bankruptcy Code requires—such that consent principles from one context readily transfer to the other.

3. The Trustee, for its part, insists that the better analogy is a settlement agreement, and it cites several cases purportedly applying state law to settlement agreements arising in the bankruptcy context. A settlement agreement, however, is materially distinct from a bankruptcy plan because settlement agreements *are* "contracts." *In re Omni Video, Inc.*, 60 F.3d 230, 232 (5th Cir. 1995).

Moreover, *Omni Video* (the Trustee's leading case) applied state law to decide the validity of a settlement agreement because "[f]ederal bankruptcy law fails to address the validity of settlements" and because

the court "perceive[d] no strong federal interest in the issue of the validity of settlements" that resolve issues in a bankruptcy case. 60 F.3d at 231-232. Whatever the merits of those determinations, they mean that *Omni Video* is irrelevant here because bankruptcy law *does* address the question of whether and how a creditor can consent to relinquish its rights through a bankruptcy plan, and because there is a strong federal interest in the validity of bankruptcy plan provisions—as demonstrated by the numerous sections of the Bankruptcy Code addressing the issue.

The Trustee's other two cases are even further afield. One involves a forum selection clause that prompted the court to apply Puerto Rico law to a settlement agreement after failing to find any applicable federal law. *In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 568 (BAP 1st Cir. 2017). Another involved a settlement agreement purportedly entered into during a bankruptcy hearing that one of the parties then sought to enforce in a diversity jurisdiction suit in federal district court. See *Am. Prairie Constr. Co.* v. *Hoich*, 594 F.3d 1015 (8th Cir. 2010). On appeal, the Eighth Circuit made the uncontroversial statement that district courts sitting in diversity generally apply the law of the state in which the district court sits to resolve questions of contract formation. *Id.* at

51

1023. But the court subsequently looked to *federal* bankruptcy law in deciding whether and how the bankruptcy context of the settlement affected its enforceability. *Id.* at 1024-25.

### C. Even If Contract Law Applies, The Opt-Out Releases Are Valid.

In any event, the District Court erred in accepting the Trustee's contention that third-party releases are impermissible under state (or federal) contract-law.[7] To the contrary, undisputed principles of contract law establish that opt-out third-party releases are consensual.

The Restatement of Contracts—on which both the District Court and Trustee relied—recognizes that, in certain circumstances, a party's silence or inaction can constitute consent to enter into a contract. As most relevant here, "silence and inaction operate[s] as an acceptance"

---

[7] Below, the Trustee contended that New York contract law governs. Trustee Br. 32-34, D. Ct. Dkt. No. 42. It has never explained why New York law governs rather than the law that would otherwise govern the released claims, or the law of the state where the releasing creditor resides. And Supreme Court precedent seemingly forecloses the Trustee's insistence that, if non-federal law governs consent, a court can simply elect to apply New York law to all the third-party releases. *Shutts*, 472 U.S. at 818 ("We think that the Supreme Court of Kansas erred in deciding on the basis that it did that the application of its laws to all claims would be constitutional."). That feature of the Trustee's theory demonstrates the unworkability of its rule in large, complex bankruptcies that often involve thousands of individual creditors.

where a party "takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation." Restatement (Second) of Contracts § 69(1)(a) (A.L.I. 1981). And silence may similarly constitute consent where a party has been "given * * * reason to understand that assent may be manifested by silence or inaction." *Id.* § 69(1)(b).

These principles generally ensure that a customer does not, for example, refuse to pay a plumber that offered to provide his services for $100 on the ground that the customer never affirmatively consented to the contract before the services were performed. But they apply equally here. The creditors whose claims were released through the Third-Party Releases in this case all received something of value under the Plan—either satisfaction of their claims against GOL or the preservation of those claims as they existed when the bankruptcy began. See pp. 12-13, *supra.* Those creditors were also provided with a "reasonable opportunity to reject" the releases by opting out, and they were "given * * * reason to understand" that their "silence or inaction" would be treated as consent. Restatement (Second) of Contracts §§ 69(1)(a)-(b) (A.L.I. 1981). As numerous courts have recognized, that is all that the Restatement

53

requires. *E.g. In re Azul S.A.*, 676 B.R. 277, 292 (Bankr. S.D.N.Y. 2026) ("New York law has also found acceptance of an offer when an offeree takes the offered benefit, regardless of the offeree's subjective intent."); *In re Spirit Airlines, Inc.*, 668 B.R. 689, 718 (Bankr. S.D.N.Y. 2025) (similar).

The District Court rejected this analysis, asserting that silence can establish consent only where a party has some independent duty to respond. JA13. But even assuming that is true, a duty to respond emanates from a creditor's participation in the reorganization, which "subject[s] him[] to the bankruptcy court's equitable power." *Langenkamp*, 498 U.S. at 44. A litigant has a duty to speak up when it believes its rights are being compromised, so when faced with an adequately noticed bankruptcy plan that prominently discloses third-party releases and the consequences of inaction, that "failure to act * * * evinces [its] intent not to claim [its known] rights." *Tatko* v. *Sheldon Slate Prods. Co.*, 769 N.Y.S.2d 626, 629 (App. Div. 2003).[8]

---

[8]     The District Court wrongly asserted that GOL has "concede[d]" that "the creditors had no duty to respond to the opt-out opportunity." JA13. That mischaracterizes what GOL has said: GOL has recognized that the releasing creditors were free to stay silent after they received the opt-out

### D. The Trustee's Remaining Arguments Lack Merit.

The Trustee has advanced a handful of other arguments against the opt-out third-party release provision in this case, but none is persuasive.

1. The Trustee has sometimes hinted that the releasing creditors here were not provided with adequate notice that their claims would be released unless they opted out. Notably, the Trustee never actually asserts a lack of notice, and for good reason. The Third-Party Releases were included in every iteration of the Plan, JA4, and the releases were "prominently displayed on ballots and the rest of the plan materials" that were sent to every releasing party. JA1869.

For Releasing Parties that were eligible to vote on the Plan, the opt-out election was included in the same ballots on which they cast a vote for the Plan. JA6. And for Releasing Parties that were ineligible to vote, the opt-out election accompanied their notice of non-voting status. JA6-7. The very first page of the ballots and forms sent to *all* of the Releasing Parties stated that "unless you take *additional action* as described herein

---

ballots, but GOL has vehemently argued that the creditors' choice to remain silent establishes their implied consent.

55

and *affirmatively opt out* of the Third-Party Release, you will be deemed to release claims you may have against certain non-Debtors." JA6.

In other words, the Releasing Parties received prominent notice of their releases through precisely the procedures that have been used *for decades* to fulfill the Bankruptcy Code's notice requirements for creditors voting on a bankruptcy plan. See 11 U.S.C. 1125(c) (requiring that a court-approved disclosure statement containing statutorily defined "adequate information" "shall be transmitted to each holder of a claim or interest of a particular class"). Those procedures have been repeatedly found adequate; indeed, the Trustee apparently agrees the notice procedures were adequate here with respect to plan voting because it has specifically stated that the remainder of the Plan can go into effect. Trustee Mem. in Supp. of Stay Pending Appeal 3, D. Ct. Dkt. No. 7 ("[B]ecause the only issue on appeal is the validity of the non-debtor release and related injunction provisions, the United States Trustee seeks a limited stay of just those provisions, not the entire plan.").

Moreover, the notice procedures here were, if anything, more robust than the procedures usually used to notify potential class members of a Rule 23 class action or settlement. Compare *Fikes Wholesale, Inc.* v.

*HSBC Bank USA, N.A.*, 62 F.4th 704, 720 (2d Cir. 2023) (explaining a settlement notice need only "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" (citation omitted)), with *In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021) ("[A] disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization" and "should likewise contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization." (citation omitted)); see also 7 *Collier on Bankruptcy* ¶ 1125.02 (16th ed. 2026) (surveying the extensive information required to be included in a disclosure statement).

Accordingly, while adequate notice is indisputably required to establish consent through opt-out procedures, there is no colorable notice argument here, and the Trustee never raised one before the Bankruptcy Court. Its dark hints about lack of notice should therefore be disregarded.

2. The Trustee also advances various arguments about why the opt-out procedures were ineffective with respect to certain subsets of

releasing parties—such as non-voting creditors, or individuals and entities bound through an agency relationship with a releasing creditor. Those arguments fail at the threshold because the Trustee did not raise them in the Bankruptcy Court. Rather, before that court, the Trustee's objection to confirmation of the Plan was a facial one; it asserted that opt-out procedures can *never* establish creditor consent. JA1359-1361. The Trustee cannot now smuggle in as-applied challenges to the sufficiency of the opt-out procedures with respect to particular groups or individuals. To reverse the District Court and affirm the bankruptcy plan confirmation order, it is enough to hold that Section 1123(b)(6) authorizes opt-out third-party release provisions.

In any event, the Trustee's as-applied challenges are meritless. It suggests that unimpaired creditors might not have attended to the opt-out notice they received because they were not also entitled to vote on the Plan. See Trustee Reply Br. 28 & n.4, D. Ct. Dkt. No. 45. But for the Trustee's theory to make sense, a non-voting creditor would have to know its rights were unimpaired under the Plan such that it could disregard formal notices sent in the bankruptcy proceeding. And if a creditor is aware of its unimpaired status under the Plan, it should also be aware of

58

the opt-out third-party releases that were a prominent feature of that Plan.

Further, accepting the Trustee's argument that the non-voting creditors lacked adequate notice cannot be squared with the principle that litigants have a duty to stay abreast of developments in the litigation to which they are a party, and "creditors have a responsibility to take an active role in protecting their claims." *In re N. New England Tel. Operations LLC*, 795 F.3d 343, 349 (2d Cir. 2015) (quoting *In re Barton Indus., Inc.*, 104 F.3d 1241, 1246 (10th Cir. 1997)). Nor is the Trustee's argument consistent with the well-established principle that mailing notice to absent class members is sufficient, even though absent class members often have no idea a class action is contemplated. *Shutts*, 472 U.S. at 812.

The Trustee also suggests that the releases impermissibly apply to the employees and agents of Releasing Parties who did not receive the notice or opt-out ballots. But in response to similar assertions at the disclosure statement stage, GOL specifically revised the definition of Related Parties to include only those individuals that could be bound

through an agency relationship. JA1713:7-9. The Trustee has not offered any persuasive reason why that agency relationship is not sufficient.

### E. The Trustee Is Alone In Objecting To The Opt-Out Consent Procedures.

Finally, it is worth noting that the Trustee is the *only* party to this bankruptcy that has objected to the opt-out consent procedures. None of the actual creditors raised any objections, nor did any creditors support the Trustee in its District Court appeal. The fact that no creditor has opposed the opt-out consent procedures strongly suggests that they *are* sufficiently respectful of creditors' rights.[9]

Moreover, it is not just the creditors in this case that have rejected the Trustee's position, it is virtually *all* of the countless bankruptcy courts to address this question.[10] Further, since the District Court issued

---

[9] This Court has held that the Trustee has appellate standing, so the fact that none of the creditors have themselves appealed does not present an Article III issue under circuit precedent. *In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010). But GOL reserves the right to challenge that holding on further review.

[10] *E.g. Spirit*, 668 B.R. at 703, 721; *Avianca Holdings*, 632 B.R. at 136-137; *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *46-47 (Bankr. S.D.N.Y. June 18, 2022); *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 287-289, 294 (Bankr. S.D.N.Y. 2016); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 270-272 (Bankr. S.D.N.Y. 2014); *In re DBSD*

the decision below, other courts have almost uniformly rejected its reasoning.[11] Most notably, the only other district court to address this question post-*Purdue* instead held (correctly) that opt-out third-party release provisions are authorized by Section 1123(b)(6). *In re Container Store Grp., Inc.*, 676 B.R. 356, 373-391 (S.D. Tex. 2026). This Court should follow suit.

---

*N. Am., Inc.*, 419 B.R. 179, 218-219 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Sprint Nextel Corp.* v. *DBSD N. Am. Inc.*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds sub nom.*, *In re DBSD N. Am., Inc.*, 627 F.3d 496 (2d Cir. 2010); *In re Calpine Corp.*, 2007 WL 4565223, at \*10 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022); *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 322-323 (Bankr. S.D. Tex. 2024); see also GOL Br. 33 n.9, D. Ct. Dkt. No. 43.

[11]     *E.g. In re Azul*, 676 B.R. at 290; Hr'g Tr. 25:14-28:6, *In re Corvias Campus Living – USG, LLC*, No. 25-11214 (Bankr. D. Del. Dec. 22, 2025), Dkt. No. 345; *In re Lutheran Home & Servs. for the Aged, Inc.*, --- B.R. ---, 2026 WL 626606, at \*28 (N.D. Ill. Mar. 4, 2026); Hr'g Tr. 12:20-25, *In re Multi-Color Corp.*, No. 26-10910 (Bankr. D.N.J. Apr. 17, 2026), Dkt. No. 782; Order, *In re Luminar Techs., Inc.*, No. 25-90807 (S.D. Tex. Apr. 1, 2026), Dkt. No. 581; Order, *In re Pine Gate Renewables, LLC*, No. 25-90669 (Bankr. S.D. Tex. Feb. 19, 2026), Dkt. No. 1483; Order, *In re PosiGen, PBC*, No. 25-90787 (Bankr. S.D. Tex. Feb. 24, 2026), Dkt. No. 613; Order, *In re Nine Energy Serv., Inc.*, No. 26-90295 (Bankr. S.D. Tex. Mar. 4, 2026), Dkt. No. 189.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment and reinstate that of the Bankruptcy Court.

Dated: April 22, 2026    Respectfully submitted,

/s/ *Colleen E. Roh Sinzdak*

EVAN R. FLECK      ANDREW M. LEBLANC
LAUREN C. DOYLE     COLLEEN E. ROH SINZDAK
MILBANK LLP       *Counsel of Record*
55 Hudson Yards      ERIN E. DEXTER
New York, NY 10001    HANNAH A. BLAZEK
(212) 530-5567      CHASE J. HANSON
efleck@milbank.com    MILBANK LLP
           1101 New York Ave., NW
           Washington, DC 20005
           (202) 835-7570
           crohsinzdak@milbank.com

*Counsel for Debtor-Appellant*

62

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume and length limitations in Second Circuit Rule 32.1(a)(4)(A) because it contains 12,550 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), as measured by the word count feature of Microsoft Office Word.

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface (Century Schoolbook) using Microsoft Office Word in 14-point font.

/s/ *Colleen E. Roh Sinzdak*
Colleen E. Roh Sinzdak

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on April 22, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Colleen E. Roh Sinzdak*
Colleen E. Roh Sinzdak