# No. 26-49

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————

IN RE: GOL LINHAS AEREAS INTELIGENTES S.A.
*Debtor*,

GOL LINHAS AEREAS INTELIGENTES S.A.,
*Debtor-Appellant*,

v.

WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE FOR REGION 2,
*Trustee-Appellee.*

———————

On Appeal from the United States District Court
for the Southern District of New York

———————

**BRIEF FOR WILLIAM K. HARRINGTON,
UNITED STATES TRUSTEE FOR REGION 2**

———————

*Of Counsel:*

LISA A. TRACY
*Deputy General Counsel*

BETH A. LEVENE
*Associate General Counsel*

FREDERICK GASTON HALL
*Trial Attorney*
*Executive Office for U.S. Trustees*
*U.S. Department of Justice*

BRETT A. SHUMATE
*Assistant Attorney General*

MICHAEL S. RAAB
MICHAEL SHIH
*Attorneys, Appellate Staff*
*Civil Division, Room 7268*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-6880*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION ................................................................. 2

STATEMENT OF THE ISSUE ........................................................................ 2

STATEMENT OF THE CASE ......................................................................... 3

      A.     Statutory Background .......................................................... 3

      B.     Factual Background .............................................................. 6

      C.     Prior Proceedings ................................................................ 9

SUMMARY OF ARGUMENT ...................................................................... 10

STANDARD OF REVIEW ............................................................................ 12

ARGUMENT ................................................................................................... 12

I.     The District Court Correctly Held That The Disputed Third-Party
     Release Is Nonconsensual And Therefore Unlawful. .......................... 12

      A.     The Release Treats Silence as Consent in Violation of
           Foundational Contract-Law Principles. ....................................... 12

      B.     Debtors' Rejoinders Lack Merit. ................................................. 17

           1.     The nonresponding claimants did not voluntarily take
                offered benefits with reasonable opportunity to reject
                them. ..................................................................................... 17

           2.     Debtors cannot manufacture consent simply by notifying
                affected claimants that their silence would be deemed
                consent. ................................................................................ 19

           3.     Claimants affected by the third-party release had no duty to
                respond. ............................................................................... 20

II.      The Bankruptcy Code Does Not Authorize Third-Party Releases Where Consent Is Assumed From Silence..........................................................22

III.    Debtors' Invocation Of The Federal Law Of Consent Is Unavailing. ..............26

        A.     The Disputed Release Is Nonconsensual Under Federal Law, Which Recognizes That Silence Does Not Equal Consent. ....................27

        B.     In the Event of a Conflict, Federal Law Would Not Govern Whether the Disputed Release Is Consensual. ..........................................28

        C.     Debtors' Policy Arguments Lack Merit.......................................................32

CONCLUSION .........................................................................................................34

CERTIFICATE OF COMPLIANCE

ADDENDUM

ii

# TABLE OF AUTHORITIES

**Cases:**                                              **Page(s)**

*American Prairie Constr. Co. v. Hoich,*
594 F.3d 1015 (8th Cir. 2010) .................................................................... 29

*Atherton v. FDIC,*
519 U.S. 213 (1997) ..................................................................................... 30

*Berk v. Choy,*
607 U.S. 187 (2026) ..................................................................................... 32

*Bullard v. Blue Hills Bank,*
575 U.S. 496 (2015) ....................................................................................... 2

*Continental Airlines Corp., In re,*
907 F.2d 1500 (5th Cir. 1990) .................................................................... 14

*Delaney, In re,*
110 F.4th 565 (2d Cir. 2024) ........................................................................ 2

*Erie R.R. Co. v. Tompkins,*
304 U.S. 64 (1938) ....................................................................................... 31

*First Central Fin. Corp., In re,*
377 F.3d 209 (2d Cir. 2004) ........................................................................ 12

*Gaston & Snow, In re,*
243 F.3d 599 (2d Cir. 2001) ........................................................................ 29

*Golden Pac. Bancorp v. FDIC,*
273 F.3d 509 (2d Cir. 2001) .............................................................. 1, 10, 14

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33 (1989) ....................................................................................... 21

*Harrington v. Purdue Pharma L.P.,*
603 U.S. 204 (2024) .................................. 1, 3, 4, 5, 11, 12, 13, 22, 23, 24, 25, 32, 33

*Harrington v. Purdue Pharma L.P.,*
No. 23A87 (U.S. Aug. 7, 2023) .................................................................... 34

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*,
   747 F.3d 44 (2d Cir. 2014) ................................................................ 27

*IBM Corp. v. Liberty Mut. Ins. Co.*,
   363 F.3d 137 (2d Cir. 2004) .............................................................. 29

*Johnson v. Zerbst*,
   304 U.S. 458 (1938) .......................................................................... 22

*Karlin v. Avis*,
   457 F.2d 57 (2d Cir. 1972) ................................................................ 30

*Langenkamp v. Culp*,
   498 U.S. 42 (1990) ............................................................................ 21

*Lawyer v. Department of Just.*,
   521 U.S. 567 ...................................................................................... 14

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   672 F.3d 155 (2d. Cir. 2012) ............................................................. 15

*LNC Invs., Inc. v. National Westminster Bank, N.J.*,
   308 F.3d 169 (2d Cir. 2002) .............................................................. 21

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
   478 U.S. 501 (1986) .......................................................................... 14

*McCowan v. Sears, Roebuck & Co.*,
   908 F.2d 1099 (2d Cir. 1990) ............................................................ 27

*Norcia v. Samsung Telecomms. Am., LLC*,
   845 F.3d 1279 (9th Cir. 2017) ........................................................... 18

*O'Melveny & Myers v. FDIC*,
   512 U.S. 79 (1994) ............................................................................ 30

*Omni Video, Inc., In re*,
   60 F.3d 230 (5th Cir. 1995) .............................................................. 29

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) .......................................................................... 26

*Prescription Home Health Care, Inc., In re*,
  316 F.3d 542 (5th Cir. 2002) ........................................................ 24

*Purdue Pharma L.P., In re*,
  No. 19-23649 (S.D.N.Y. Bankr. June 20, 2025) ........................... 34

*Purdue Pharma L.P., In re*,
  No. 21-cv-7532 (S.D.N.Y. Nov. 15, 2021) ................................... 33

*Railway Lab. Execs.' Ass'n v. Gibbons*,
  455 U.S. 457 (1982) ..................................................................... 13

*Raleigh v. Illinois Dep't of Revenue*
  530 U.S. 15 (2000) ....................................................................... 29

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ........................................................ 17

*Reichert v. Rapid Invs., Inc.*,
  56 F.4th 1220 (9th Cir. 2022) ..................................................... 18

*Rodriguez v. FDIC*,
  589 U.S. 132 (2020) ..................................................................... 30

*Roell v. Withrow*,
  538 U.S. 580 (2003) ..................................................................... 22

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ..................................................................... 32

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011) ..................................................................... 25

*Sturges v. Crowninshield*,
  17 U.S. (4 Wheat.) 122 (1819) ...................................................... 4

*Tatko v. Sheldon Slate Products Co.*,
  769 N.Y.S.2d 626 (App. Div. 2003) ........................................... 20

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ..................................................................... 14

v

*Tennessee Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004) ................................................................... 4

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*,
    549 U.S. 443 (2007) ............................................................ 28, 31

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................................................. 26

*United States v. Energy Resources Co.*,
    495 U.S. 545 (1990) ................................................................. 24

*United States v. Olano*,
    507 U.S. 725 (1993) ............................................................ 21, 22

*United States v. Sanchez-Gomez*,
    584 U.S. 381 (2018) ................................................................. 25

*Wellness International Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015) ................................................................. 22

*Wright v. Union Cent. Life Ins. Co.*,
    304 U.S. 502 (1938) ............................................................. 3, 12

*Wu v. Uber Techs., Inc.*,
    260 N.E.3d 1060 (N.Y. 2024) .............................................. 29-30

*Zarnel, In re*,
    619 F.3d 156 (2d Cir. 2010) ....................................................... 5

## U.S. Constitution:

Art. I, § 8, cl. 4 ....................................................................... 13

## Statutes:

Bankruptcy Act of 1800, ch. 19, 2 Stat. 19 ................................. 5

11 U.S.C. § 307 ............................................................................ 5

11 U.S.C. § 524(e) ....................................................................... 4

11 U.S.C. § 524(g)(4)(A)(ii) ........................................................................ 5

11 U.S.C. § 541(a) ....................................................................................... 3

11 U.S.C. § 542(g)(4)(A)(ii) ...................................................................... 13

11 U.S.C. § 1122 ......................................................................................... 3

11 U.S.C. § 1123(b)(1) .............................................................................. 23

11 U.S.C. § 1123(b)(2) .............................................................................. 23

11 U.S.C. § 1123(b)(3) .............................................................................. 23

11 U.S.C. § 1123(b)(4) .............................................................................. 23

11 U.S.C. § 1123(b)(5) .............................................................................. 23

11 U.S.C. § 1123(b)(6) ..................................................................... 11, 13, 23

11 U.S.C. § 1125(b) ..................................................................................... 3

11 U.S.C. § 1126(a) ..................................................................................... 3

11 U.S.C. § 1126(c)-(d) ............................................................................... 4

11 U.S.C. § 1126(f) ..................................................................................... 3

11 U.S.C. § 1129 ......................................................................................... 3

11 U.S.C. § 1129(a)(7) .............................................................................. 18

11 U.S.C. § 1129(a)(9) .............................................................................. 18

11 U.S.C. § 1141(a) ................................................................................. 4, 18

11 U.S.C. § 1141(d)(1)(A) ........................................................................... 4

28 U.S.C. § 158(a)(1) ................................................................................... 2

28 U.S.C. § 158(d)(2)(A) ............................................................................. 2

28 U.S.C. §§ 581-589a ................................................................................ 5

28 U.S.C. § 586(a)(3)(B) ................................................................................. 5

28 U.S.C. § 1332 ............................................................................................. 31

28 U.S.C. § 1334(a) ........................................................................................ 2

**Rules:**

Fed. R. Bankr. P. 7023 .................................................................................. 25

Fed. R. Civ. P. 23(a)-(e) ................................................................................ 25

Fed. R. Civ. P. 23(c) ...................................................................................... 32

Fed. R. Civ. P. 23(c)(2)(B)(v) ....................................................................... 25

Fed. R. Civ. P. 23(g) ...................................................................................... 25

**Legislative Materials:**

H.R. Rep. No 95-595 (1977) ......................................................................... 5

**Other Authorities:**

1 Arthur L. Corbin, *Corbin on Contracts* (2025)
§ 3.18 ....................................................................................................... 15
§ 3.19 ....................................................................................................... 16

Restatement (Second) of Contracts (Am. Law Inst. 1981)
§ 69 ........................................................................................... 15, 17, 18, 19
§ 284 ........................................................................................................ 14

2 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* (4th ed.),
§ 6:67 .................................................................................................... 1, 15
§ 6:70 .................................................................................................. 19, 20

# INTRODUCTION

In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court held that the Bankruptcy Code does not authorize courts to extinguish a nondebtor's claim against another nondebtor without the claimant's consent. The Court explained that these provisions, known as nonconsensual third-party releases, are at odds with the Code's text, structure, and history.

This case arises from a bankruptcy plan containing a third-party release that "conclusively, absolutely, unconditionally, irrevocably, and forever release[s], waive[s], and discharge[s]" a wide range of claims belonging to nondebtors against an unspecified number of other nondebtors. JA1829. Although the plan allows claimants to opt out of the release, it provides that any claimant who does not affirmatively opt out shall be deemed to have consented to the release.

As the district court correctly held, this release is nonconsensual and therefore unlawful under *Purdue*. "A release is a species of contract and is governed by principles of contract law." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001) (quotation marks omitted). And it is a rule "almost universally" acknowledged in contract law that, absent exceptional circumstances, "silence will not amount to acceptance." 2 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 6:67 (4th ed.), Westlaw (database updated May 2026). The release violates that rule by permanently extinguishing claims belonging to more than 2,600 claimants who

remained silent instead of opting out. The district court's judgment should therefore be affirmed.

## STATEMENT OF JURISDICTION

The bankruptcy court had jurisdiction over debtors' bankruptcy under 28 U.S.C. § 1334(a). The bankruptcy court confirmed debtors' reorganization plan on May 21, 2025. JA8. The district court had jurisdiction over the U.S. Trustee's appeal of the bankruptcy court's order under 28 U.S.C. § 158(a)(1), which grants district courts appellate jurisdiction over final orders in bankruptcy cases. A confirmation order is a final order. *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015). On December 2, 2025, the district court entered a judgment "revers[ing]" the confirmation order, striking the third-party release provisions from the plan, and remanding the case to the bankruptcy court for further proceedings. JA18. Debtors timely appealed. JA19. This Court has jurisdiction under 28 U.S.C. § 158(d)(2)(A) because the district court's judgment is a final order. The judgment does not contemplate "significant further proceedings in [the] bankruptcy court." *In re Delaney*, 110 F.4th 565, 568 (2d Cir. 2024). On remand, the bankruptcy court must simply implement the district court's decision striking the disputed provisions.

## STATEMENT OF THE ISSUE

Whether the disputed third-party release, which permanently extinguishes claims belonging to thousands of nondebtors against other nondebtors unless an affected claimant affirmatively opts out, is nonconsensual and therefore unlawful.

## STATEMENT OF THE CASE

### A.  Statutory Background

Bankruptcy is the "subject of the relations between a[] . . . debtor and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation marks omitted).  The Bankruptcy Code is a comprehensive scheme that establishes a highly reticulated mechanism for the equitable adjustment of the debtor-creditor relationship.  "When a debtor files for bankruptcy, it 'creates an estate' that includes virtually all the debtor's assets." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 214 (2024) (quoting 11 U.S.C. § 541(a)).  Chapter 11 of the Code allows "the debtor [to] work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval." *Id.*

A plan cannot be confirmed unless it satisfies certain statutory prerequisites.  One such prerequisite is obtaining the approval of each impaired class of claims or interests.  11 U.S.C. § 1129(a)(8); *see id.* § 1122 (providing for the division of a debtor's creditors into classes based on their claims' nature and priority).  Only creditors whose claims are impaired by a plan are entitled to vote on it.  *Id.* § 1126(a), (f).  To inform that decision, the Bankruptcy Code requires a plan's proponents to send creditors a disclosure statement containing "adequate information" about the plan.  *Id.* § 1125(b).  A class accepts a plan if class members "hold[ing] at least two-thirds in amount and

3

more than one-half in number of the allowed claims" or "interests" have voted to accept it. *Id.* § 1126(c)-(d).

Once the bankruptcy court has confirmed a plan, "that document binds the debtor and its creditors going forward—even those who did not assent to the plan." *Purdue*, 603 U.S. at 214 (citing 11 U.S.C. § 1141(a)). The effect of confirmation is to "'discharge[] the debtor from any debt that arose before the date of such confirmation,' except as provided in the plan, the confirmation order, or the code." *Id.* (quoting 11 U.S.C. § 1141(d)(1)(A)). This "discharge not only releases or 'void[s] any past or future judgments on the' discharged debt; it also 'operat[es] as an injunction . . . prohibit[ing] creditors from attempting to collect or to recover the debt.'" *Id.* at 215 (alterations in original) (quoting *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004)).

"Every bankruptcy law" of which we are aware, "from 1800 until 1978," has "generally reserved the benefits of discharge to the debtor who offered a 'fair and full surrender of [its] property.'" *Purdue*, 603 U.S. at 223-24 (alteration in original) (quoting *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 176 (1819)). None of the current Bankruptcy Code's hundreds of provisions expressly authorizes, as a general matter, bankruptcy courts to discharge claims belonging to nondebtors against other nondebtors. To the contrary, the Code specifies that a discharge of a debt "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

4

Since Congress enacted the Nation's first bankruptcy law over two centuries ago, *see* Bankruptcy Act of 1800, ch. 19, 2 Stat. 19, Congress has departed from this longstanding practice just once. In § 524(g) of the Code, which applies exclusively to bankruptcies involving asbestos, Congress authorized courts to extinguish a limited category of nondebtors' claims against other nondebtors without consent. 11 U.S.C. § 524(g)(4)(A)(ii). Accordingly, the Supreme Court recently held that the Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Purdue*, 603 U.S. at 227.

Congress has authorized the Attorney General to appoint U.S. Trustees, who are Department of Justice officials, to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581-589a. U.S. Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977). They "may raise and may appear and be heard on any issue in any case or proceeding" brought under the Bankruptcy Code. 11 U.S.C. § 307; *accord In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010) (holding that U.S. Trustees have standing to pursue bankruptcy appeals because of their "responsibility to represent and protect the public interest"). Congress specifically empowered U.S. Trustees to comment on Chapter 11 reorganization plans. 28 U.S.C. § 586(a)(3)(B).

### B.  Factual Background

Debtors operate a domestic airline in Brazil.  JA2.  In January 2024, debtors filed a voluntary Chapter 11 petition in the Southern District of New York.  JA2-3.  At the time, "Debtors had approximately $4.1 billion of outstanding debt, of which approximately $2.2 billion was secured by the Debtors' assets."  JA3.  Debtors proposed, and the district court confirmed, a reorganization plan that emerged from negotiations between debtors, their largest secured creditor (an airline group that partners with GOL called Abra Group Limited (Abra)), and the Official Committee of Unsecured Creditors.  JA1820-28.

The confirmed plan contains a third-party release and injunction that permanently extinguishes claims belonging to thousands of nondebtors against an indeterminate number of other nondebtors.  The release is broad enough to cover everything from a claim against a GOL flight attendant who injured a passenger on a flight, to a claim against one of GOL's accountants by one of GOL's Brazilian suppliers, to a claim against Abra by one of GOL's creditors for allegedly forcing GOL into bankruptcy.

The plan accomplishes this by terminating "any and all claims" (except those for "willful misconduct, intentional fraud, or gross negligence") to the extent that they "in any manner aris[e] from" (1) the "management, ownership, or operation" of debtors, (2) the "transactions or events giving rise to[] any Claim or Interest dealt with in the Plan," (3) the purchase or sale of debtors' securities, and (4) debtors' business

6

or contractual arrangements with other creditors. JA1829-30 (quotation marks omitted). The plan also enjoins anyone from "commencing or continuing any action or proceeding of any kind" to enforce any released claim. JA1833 (citation modified).

The beneficiaries of the release are (1) the debtors and reorganized debtors; (2) the Official Committee of Unsecured Creditors; (3) four additional entities who are not debtors, including Abra; and (4) all "Related Parties" of the named entities. JA1829 n.8. The term "Related Parties" includes all

> "current and former . . . directors, managers, officers, . . . committee members, . . . equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees."

*Id.* The overwhelming majority of these released parties are not debtors in GOL's bankruptcy.

The release binds two principal categories of nondebtor claimants—"creditors eligible to vote on the Plan, and creditors with unimpaired claims who cannot vote on the Plan but are still subject to the third-party release," JA6—as well as their related parties (defined in the same broad fashion as above), JA1829 n.7. Affected claimants that were eligible to vote were permitted to "opt out of [the release] by checking the appropriate box on the ballot . . . sent to them." JA6. Affected claimants that were

not eligible to vote instead received a "Notice of Non-Voting Status" and could "opt out" by returning a form. JA6-7. In either case, claimants who remained silent were "deemed" to have consented to the "release" of any claims they may have against the released nondebtors. JA6 (quotation marks omitted).

A total of 688 ballots were sent to creditors eligible to vote on the plan, of which 63 were returned as undeliverable. JA7. Of the 617 ballots returned, "more than half of them (323) chose to opt out of the third-party release." JA7. A total of 2,603 "Notices of Non-Voting Status" were sent to creditors not eligible to vote on the plan, of which 69 were returned as undeliverable. JA7. "Only 14 of these notices (0.5 percent of those mailed) were returned and, on 11 (almost 80 percent of those returned), the opt-out box was checked." JA7. Thus, GOL's reorganization plan permanently extinguishes a wide range of claims against an untold number of nondebtors that belong to over 2,600 other nondebtors, not one of whom affirmatively consented to that result.

By its terms, the release does not compensate any claimant for the value of any extinguished claim against a nondebtor. Nor does the release affect any claimant's treatment under GOL's reorganization plan. As debtors acknowledge (Br. 13), whatever value claimants are entitled to receive under the plan has nothing to do with whether the claimant opted out of the release.

8

## C.      Prior Proceedings

During debtors' bankruptcy, the U.S. Trustee objected to the reorganization plan on the ground that its third-party release provisions were nonconsensual and therefore unlawful.  The bankruptcy court overruled that objection and confirmed the plan.  JA1870-71.  The court's analysis began from the premise that federal law controls the question whether claimants who failed to opt out of the release had nevertheless consented to it.  JA1850-64.  The court then determined, relying on cases governing how litigants may consent to the adjudication of their claims by an Article I tribunal, that federal law permits silence to be treated as consent in these circumstances.  JA1864-67.  Applying that standard, the court concluded that the release at issue was consensual with respect to the more than 2,600 nonresponding claimants.  JA1868-70.

The district court reversed the confirmation order on appeal and struck the third-party release and injunction provisions from the plan.  JA18.  The confirmation order, the court explained, was based on the incorrect premise that "all parties that consent to a bankruptcy court's jurisdiction necessarily consent to any release the court may approve."  JA15.  The appropriate standard for evaluating consent instead comes from "general principles of contract law," which are the "same . . . under both federal and state law."  JA12.  Those principles, "as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence."  JA15.  Under the correct standard, the disputed third-party release—which

9

equates a claimant's failure to opt out with affirmative assent to the release—is nonconsensual and therefore barred by the Bankruptcy Code. JA12.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that the plan's third-party release provisions are nonconsensual and therefore barred by the Bankruptcy Code. "A release is a species of contract" that is governed by contract law. *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001). Accordingly, the law of contract determines whether the disputed release is consensual. Regardless of whether federal or state contract law applies, the outcome is the same: "consent cannot be implied from silence" in all but exceptional cases. JA15. The release at issue—which treats the silence of over 2,600 affected claimants as consent to irrevocably terminate their claims against an indeterminate number of nondebtors—violates that cardinal rule.

Debtors have failed to prove that this case fits into one of the rule's few exceptions. First, debtors contend that the nonresponding claimants impliedly consented to the release by voluntarily accepting the benefits the release confers. But the only alleged benefit debtors have identified—the value granted to claimants by debtors' reorganization plan for their claims against debtors—is what claimants were legally entitled to receive as a result of their status as creditors in debtors' bankruptcy. That is not accepting a benefit. Second, debtors contend that the nonresponding claimants impliedly consented because debtors clearly told them that their silence would be treated as consent. But a clear statement of that sort is effective if and only

10

if the nonresponding claimants intended their silence to mean consent. Debtors have failed to identify any evidence to that effect. Finally, debtors' assertions notwithstanding, the nonresponding claimants did not forfeit their claims against the released third parties by failing to opt out, since the claimants had no legal duty to respond in the first place.

II. Debtors next argue that the bankruptcy court had statutory authority to approve the disputed third-party release under 11 U.S.C. § 1123(b)(6). That paragraph of the Bankruptcy Code contemplates that a reorganization plan may "include any other appropriate provision not inconsistent with the applicable provisions of" the Code. 11 U.S.C. § 1123(b)(6). But as the Supreme Court held in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the powers granted by § 1123(b)(6) are limited to the context supplied by the "five specific sorts of provisions" that precede it, "all of which concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* at 218 (emphasis in original). The release, which purports to terminate nondebtors' claims against other nondebtors under a theory of consent foreclosed by contract law, bears no resemblance to the provisions enumerated in § 1123(b).

III. Finally, debtors urge this Court to conclude both that federal law controls the question whether a third-party release is consensual and that federal law permits silence to be treated as consent in this context. But as the district court held, any conceivably applicable law of consent "establish[es] that, outside of rare exceptions, consent cannot be implied from silence." JA15. Accordingly, this Court

need not reach the choice-of-law issue. Even if federal law differed from state law, this Court's cases indicate that federal law would not govern the specific consent question presented. Debtors have identified no basis for overriding the applicable state law, which here is supplied by the law of New York—a jurisdiction that has long embraced the general rule that silence is not consent. The third-party release is clearly nonconsensual under that rule.

## STANDARD OF REVIEW

This Court exercises "plenary review" over the district court's judgment. *In re First Central Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004). The district court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error. *Id.*

## ARGUMENT

**I.     The District Court Correctly Held That The Disputed Third-Party Release Is Nonconsensual And Therefore Unlawful.**

      **A.     The Release Treats Silence as Consent in Violation of Foundational Contract-Law Principles.**

Bankruptcy is the "subject of the relations between a[] . . . debtor and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation marks omitted). "[B]eneath [the] complexity" of the Bankruptcy Code "lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024). To implement that bargain,

12

the Code grants courts unusual powers to modify relations between debtors and their creditors. These powers are authorized by the Constitution to address a debtor's true financial distress. *Railway Lab. Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982); *see* U.S. Const. art. I, § 8, cl. 4.

By contrast, the Bankruptcy Code does not grant courts any general authority to release nondebtors from personal liability to other nondebtors. Except for a narrow provision involving asbestos liability that does not apply here, 11 U.S.C. § 542(g)(4)(A)(ii), the Code does not expressly authorize bankruptcy courts to resolve such claims. And although the Code contemplates that a reorganization plan may "include any other appropriate provision not inconsistent with the applicable provisions of" the Code, *id.* § 1123(b)(6), this catchall paragraph does not mean that "everything not expressly prohibited is permitted," *Purdue*, 603 U.S. at 218 (quotation marks omitted). To the contrary, the catchall paragraph must be interpreted in light of the "five specific sorts of provisions" that precede it, "all of which concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* (emphasis in original). Accordingly, the catchall paragraph "does not authorize a release and injunction that . . . effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Id.* at 227. As the Supreme Court recently held in *Purdue*, permitting bankruptcy courts to impose such nonconsensual releases on nondebtor third parties would contravene the Code's text, structure, and history. *Id.* at 215-24.

13

The Supreme Court's analysis was confined to nonconsensual releases and did not address consensual releases, the authority for which fundamentally arises from basic contract principles. "A release is a species of contract and is governed by principles of contract law." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001) (quotation marks omitted). When a bankruptcy court includes such a release in a reorganization plan, the release has legal force if it constitutes a binding contract. *In re Continental Airlines Corp.*, 907 F.2d 1500, 1508-09 (5th Cir. 1990); *cf. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986) (holding that consent decrees may contain provisions going beyond what a district court would ordinarily have the power to authorize because the "source of the court's authority to enter any judgment at all" stems from "the parties' agreement," "rather than the force of the law upon which the complaint was originally based"); *Lawyer v. Department of Just.*, 521 U.S. 567, 579 n.6 (similar). "[A] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) (quotation marks omitted).

Because a release is a contract, contract law controls the question whether a release is consensual. Restatement (Second) of Contracts § 284 cmt. c (A.L.I. 1981), Westlaw (database updated Oct. 2024) ("The rules of interpretation that apply to contracts generally apply also to . . . releases."). As the district court recognized, "the general principles of contract law, as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence."

14

JA15; *see* Restatement (Second) of Contracts § 69 cmt. a (stating that, except in "exceptional" circumstances, "an offeror does not have power to cause the silence of the offeree to operate as acceptance"); *accord* 1 Arthur L. Corbin, *Corbin on Contracts* § 3.18 (2025) ("It is certain that, if the only facts are that A makes an offer to B, and B remains silent, there is no contract."); 2 Williston & Lord, *supra* § 6:67 ("As a general rule, an offeree does not need to reply to an offer, and its silence and inaction will not be construed as an assent to an offer."). Indeed, the Restatement specifically provides that "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." Restatement (Second) of Contracts § 69 cmt. a. This rule is "almost universally applicable," 2 Williston & Lord, *supra*, § 6:67, and is a cornerstone of both federal law and the law of New York, *see* JA12-15 (surveying cases).[1]

The general rule that silence does not equal consent resolves this case. The release and injunction provisions of GOL's reorganization plan irrevocably terminate all manner of claims belonging to over 2,600 nondebtors against other nondebtors.

---

[1] As explained below, *infra* pp. 28-30, the question whether the disputed release is consensual should be evaluated under the law of New York. But the district court did not need to reach the question of which jurisdiction's law should apply because "[a] choice-of-law analysis need not be performed unless there is an actual conflict between the applicable rules of two relevant jurisdictions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d. Cir. 2012) (per curiam) (quotation marks omitted), quoted in JA12. Here, "the same general principles of contract law apply under both federal and state law, so there is no conflict." JA12. This Court should follow the same course here.

Claimants who do not affirmatively opt out of the release by returning a form to the bankruptcy court are deemed to have consented to it. But for purposes of determining whether a contract is consensual, deemed consent—that is, silence—is not consent at all. Accordingly, the disputed release is a nonconsensual third-party release not authorized by the Code.

A hypothetical illustrates the point. Imagine that Doe has a claim against Smith. One day, Smith sends Doe a letter stating that, unless Doe affirmatively opts out by returning a form by some date, Doe shall be deemed to have consented to release the claim against Smith. If Doe does not return the form by the date specified, no court would hold that Doe's silence should be treated as consent to the release. Smith "cannot, merely by saying that [Doe]'s silence will be taken as an acceptance, cause it to be operative as such. The offeror cannot force the offeree to take pen in hand, to use a postage stamp, or to speak, under penalty of being bound by a contract by not expressing a rejection." 1 Corbin, *supra* § 3:19.

What debtors have purported to accomplish here is even more problematic because debtors are not even a relevant contracting party for purposes of the relevant released claims. The hypothetical contract described above would still be nonconsensual if the letter proposing the opt-out release of Doe's claim against Smith had come not from Smith but from Jones, who neither owns Doe's claim against Smith nor is the person against whom Doe's claim flows. Accordingly, the disputed release—which applies even to claims that do not belong to debtors or flow against

16

debtors, but instead belong to over 2,600 nondebtors and flow against other nondebtors—is not consensual either.

### B.    Debtors' Rejoinders Lack Merit.

Only in "exceptional" circumstances will contract law equate silence with consent.  Restatement (Second) of Contracts § 69 cmt. a.  Debtors' efforts to satisfy those exceptions are unavailing.

### 1.    The nonresponding claimants did not voluntarily take offered benefits with reasonable opportunity to reject them.

In a few conclusory sentences, debtors invoke (Br. 53-54) the principle that, "[w]here an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation," "his silence [or] inaction operate as an acceptance."  Restatement (Second) of Contracts § 69(1)(a).  This commonsense exception means that, for example, someone "who sees apples offered for 50 cents apiece and takes an apple, owes 50 cents, regardless whether he did or did not say, 'I agree.'"  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).  The cornerstone of this exception is some voluntary action by one party to take benefits offered by the other party (such as taking the apple).

This case does not fall within the cited exception.  To start, the third-party release does not itself give affected claimants anything of value.  The only benefit claimants allegedly accepted for releasing their claims against nondebtors—"either

17

satisfaction of [claimants'] claims against [debtors] or the preservation of those claims as they existed when [debtors'] bankruptcy began," Br. 53—is what claimants were entitled to receive under debtors' reorganization plan for their claims against debtors. *See generally* 11 U.S.C. § 1129(a)(7), (9). Debtors cannot plausibly contend that the plan payouts were available to claimants only at the price of compensation in the form of a third-party release of claims against nondebtors. As debtors have acknowledged (Br. 13), whether claimants opted out of the third-party release made no difference to their recoveries under the plan. *See* 11 U.S.C. § 1123(a)(4) (requiring, as a general rule, that every claim in a particular class be treated identically). A claimant's acceptance of recoveries under debtors' plan, to which the claimant was already entitled, is not acceptance of a "benefit" at all. *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1231 (9th Cir. 2022) (per curiam); *accord Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017).

In addition, the claimants lacked a "reasonable opportunity to reject" the alleged benefits of the release. Restatement (Second) of Contracts § 69(1)(a). As creditors in debtors' bankruptcy, the claimants are bound by the terms of the plan, which specifies how much they will receive for their claims against debtors. 11 U.S.C. § 1141(a) (providing that, except in two circumstances not applicable here, "the provisions of a confirmed plan bind . . . any creditor" of the debtor "whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan").

18

> **2.** **Debtors cannot manufacture consent simply by notifying affected claimants that their silence would be deemed consent.**

Debtors assert (Br. 53), in another conclusory sentence, that consent may be inferred from the nonresponding claimants' silence because all affected claimants were clearly told that failure to opt out would be treated as consent. As discussed, that is exactly what an offeror is not allowed to do when attempting to form a valid contract. *See supra* pp. 14-15; Restatement (Second) of Contracts § 69(1)(b) (explaining that it is not enough for the offeror to "state[] . . . that assent may be manifested by silence or inaction"); 2 Williston & Lord, *supra*, § 6:70 ("[T]he offeror cannot, merely by indicating that it will take silence to mean assent, cast the burden to speak on the offeree . . . ."). An offeror's clear statement that silence equals consent may be effective if and only if "the offeree in remaining silent and inactive intends to accept the offer." Restatement (Second) of Contracts § 69(1)(b). Debtors have failed even to cite that key restriction.

Even if debtors had not forfeited any argument as to the nonresponding claimants' intentions, this Court would have no basis for concluding that any (much less all) of the over 2,600 nonresponding claimants intended their silence to mean acceptance. The bankruptcy court made no such finding. Nor could it have, since the claimants' "silence" may be attributable to "a variety of causes." 2 Williston & Lord, *supra*, § 6:70. The record shows that a total of 132 opt-out ballots and non-voting notices were returned as undeliverable. *See* JA7. Claimants who remained

19

silent despite receiving such forms may "have made a mental determination to reject the offer" or "made no determination with respect to the offer whatsoever." 2 Williston & Lord, *supra*, § 6:70. Claimants—especially those not well-versed in the intricacies of American bankruptcy law—may also have failed to appreciate that the bankruptcy court would treat their silence as consent to cut off claims against a long yet indeterminate list of people who were not debtors in the bankruptcy.

### 3. Claimants affected by the third-party release had no duty to respond.

Debtors assert (Br. 54) that the nonresponding claimants' silence is consent because claimants had a duty to respond to the opt-out notices they received. Debtors derive this asserted duty from *Tatko v. Sheldon Slate Products Co.*, 769 N.Y.S.2d 626 (App. Div. 2003), which held that a minority shareholder had waived his right to challenge certain corporate actions by failing to expressly object to them, as New York Business Corporation Law required him to do. *Id.* at 628-29. But neither the Bankruptcy Code nor any other principle of law imposes such a duty on claimants here. JA13.

Debtors argue (Br. 39-41, 54) that the nonresponding claimants were obliged to tell the bankruptcy court that they wanted to preserve their claims against nondebtors due to their status as creditors in GOL's bankruptcy. Debtors contend (Br. 39-40) that, just as a party in ordinary litigation may forfeit its rights by failing to assert them in a timely fashion, the nonresponding claimants forfeited their right to object to the

20

release by remaining silent in response to the opt-out notices. But this analogy fails because a claim against a nondebtor is not a right that may ordinarily be extinguished in a bankruptcy proceeding, which is only about claims against the debtor. Creditors who "submit[] a claim against [a] bankruptcy estate . . . subject themselves to the court's equitable power [over] those claims," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59, 59 n.14 (1989), and any other claims by or against the debtor that are "part of the claims-allowance process[,] which is triable only in equity," *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) (per curiam). That is why a creditor's failure to respond to bankruptcy court notices may have adverse consequences for the creditor's bankruptcy claims. But that principle does not support the remarkable proposition that a creditor confers upon the bankruptcy court the power to decide every single claim the creditor owns—even claims against people and entities who are not debtors—just by filing a proof of claim. JA15. So a creditor who remains silent in response to a bankruptcy court notice pertaining to claims against nondebtors cannot be said to have assented to a contract permanently extinguishing those claims.

Debtors' conflation of "principles of . . . forfeiture" with "waiver," Br. 39, only underscores their error. The two doctrines are distinct. "[F]orfeiture is the failure to make the timely assertion of a right," *United States v. Olano*, 507 U.S. 725, 733 (1993), and may occur "unintentional[ly]" due to "inadverten[ce]" or neglect, *LNC Invs., Inc. v. National Westminster Bank, N.J.*, 308 F.3d 169, 176 & n.8 (2d Cir. 2002). "[W]aiver," by contrast, "is the 'intentional relinquishment or abandonment of a known right.'"

*Olano*, 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A party that forfeits a right by failing to lodge a timely objection cannot be said to have consented to the consequences of its default.

Debtors' reliance (Br. 36-37) on *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), is misplaced. That case holds that "Article III is not violated when the parties knowingly and voluntarily" consent to bankruptcy-court adjudication of a claim that must otherwise be heard by an Article III judge. *Wellness Int'l*, 575 U.S. at 669. Such consent may be implied if "'the litigant . . . was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* at 685 (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)). Debtors have failed to cite, and we are not aware of, any evidence indicating that the nonresponding claimants engaged in any voluntary conduct, litigation-related or otherwise, that manifests an intent to allow the bankruptcy court to adjudicate the released claims against nondebtors—much less an intent to allow the court to terminate those claims without adjudication.

## II.    The Bankruptcy Code Does Not Authorize Third-Party Releases Where Consent Is Assumed From Silence.

Debtors separately argue (Br. 31-43) that, whether or not opt-out third-party releases are consensual under contract law, § 1123(b)(6) of the Bankruptcy Code authorizes bankruptcy courts to adopt them. That argument cannot be reconciled with the Supreme Court's reasoning in *Purdue*, which held that the § 1123(b)(6)

22

catchall is "constrained" by the five paragraphs preceding it. 603 U.S. at 219; *see supra* p. 13. The disputed release is not remotely similar to the plan terms enumerated in those paragraphs. Those terms allow plans to "impair or leave unimpaired any class of claims" against the debtor, 11 U.S.C. § 1123(b)(1); to "provide for the assumption, rejection, or assignment of" certain "executory contract[s] or unexpired lease[es] of the debtor," *id.* § 1123(b)(2); to retain or dispose of any claim or interest belonging to the debtor or to the estate, *id.* § 1123(b)(3); to "provide for the sale of all or substantially all of the property of the estate" and to "distribut[e] . . . the proceeds . . . among holders of claims or interests," *id.* § 1123(b)(4); and to "modify the rights" of certain creditors with claims against the debtor or "leave unaffected the rights of holders of any class of claims," *id.* § 1123(b)(5). None of these terms (which all relate to the debtor or the bankruptcy estate) is analogous to the disputed release, which purports to terminate over 2,600 nondebtors' claims against other nondebtors by presuming—in defiance of ordinary contract-law principles—that the silence of nonresponding claimants amounts to consent. Section 1123(b)(6) thus does not authorize the release.

In arguing otherwise, debtors focus on various Bankruptcy Code provisions that they interpret to allow bankruptcy courts to imply consent from a failure to object. Br. 33-35, 38 (discussing § 1123(b)(4) in conjunction with § 363(f)(2), as well as §§ 1123(a)(4), 1126(c), and 1129(a)(9)). But even if debtors' interpretation of those provisions were correct—a question that is not before this Court—any power those

23

provisions confer is confined to creditors' rights in relation to a debtor's estate or claims against the estate. Because those provisions are designed for adjusting the relationship between a debtor and its creditors, they supply no basis for reading § 1123(b)(6) to permit adjustment of the relationship between nondebtors in defiance of ordinary contract-law principles. Nor do they empower a court to disregard those principles by approving a release terminating claims between nondebtors. That would violate the "simple bargain" underlying the Code. *Purdue*, 603 U.S. at 209.

Debtors also invoke *United States v. Energy Resources Co.*, 495 U.S. 545 (1990). But *Purdue* addressed and rejected a similar invocation of that case. As *Purdue* explained, *Energy Resources* simply establishes that § 1123(b)'s catchall paragraph "confer[s] additional authorities on a bankruptcy court." 603 U.S. at 218. *Energy Resources* did not hold that those "additional authorities" extended beyond "*the debtor—its rights and responsibilities, and its relationship with its creditors.*" *Id.* (emphasis in original). The facts of *Energy Resources* reinforce this point. There, the Supreme Court affirmed a bankruptcy court's decision to order that tax payments from the debtor to the Internal Revenue Service (one of its creditors) be allocated in a certain way. *Energy Res.*, 495 U.S. at 550. To reach that conclusion, the Court emphasized bankruptcy courts' "broad authority to modify creditor-debtor relationships." *Id.* at 549; *cf. In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 549 (5th Cir. 2002) ("Nothing in *Energy Resources* suggests that bankruptcy courts have jurisdiction to determine the tax liabilities of non-debtors.").

24

With their bankruptcy-specific arguments unavailing, debtors seek support (Br. 41-43) from the rules governing class actions, which authorize a court to include in certain classes anyone who does not affirmatively "request[] exclusion," Fed. R. Civ. P. 23(c)(2)(B)(v). This express deviation from ordinary consent principles only highlights Congress's decision not to include any similar authorization in the Bankruptcy Code. The two mechanisms are distinct. *Purdue*, 603 U.S. at 220 (holding that, although "bankruptcy law may serve to address some collective-action problems," that statutory purpose does not justify "provid[ing] a bankruptcy court with a roving commission to resolve all such problems that happen its way, blind to the role other mechanisms," such as "class actions," "play in addressing them"); *accord* JA16 ("The opt-out mechanism utilized in the class action context simply does not apply to the third-party release here.").

If debtors wish to obtain the benefits of a class action, they must actually initiate a class action and comply with the rules governing them. *See* Fed. R. Civ. P. 23(a)-(e), (g); Fed. R. Bankr. P. 7023. Debtors may not transform a bankruptcy proceeding into a "*de facto* class action[]" by importing features unique to the "particular" context of class actions into a reorganization plan under Chapter 11. *See United States v. Sanchez-Gomez*, 584 U.S. 381, 388-89 (2018) (quotation marks omitted); *accord Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) (holding that a "properly conducted class action, with binding effect on nonparties, can come about in federal courts in just one way": using Rule 23 (quotation marks omitted)). As the Supreme

25

Court recently held in *Trump v. CASA, Inc.*, 606 U.S. 831, 849-50 (2025), Rule 23 cannot be sidestepped in this manner.

Debtors' citation (Br. 42-43) to *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811 (1985), does not advance their case. *Shutts* held that the Fourteenth Amendment's Due Process Clause is not offended by a state court exercising personal jurisdiction over out-of-state class members so long as each class member has notice, an opportunity to opt out, and is adequately represented by the named class plaintiffs. 472 U.S. at 811-12. That constitutional holding, arising from an entirely different context, has no bearing on the statutory question here: whether § 1123(b)(6) of the Bankruptcy Code authorizes bankruptcy courts to presume consent from silence in the context of third-party claims. Moreover, even if *Shutts* sheds light on the question at issue, the Court's holding turned on certain "safeguards" specifically adopted by the applicable class-action rules. *Id.* at 810. The bankruptcy court indisputably failed to comply with those safeguards here.

## III. Debtors' Invocation Of The Federal Law Of Consent Is Unavailing.

Finally, debtors essentially invite (Br. 31-41) this Court to invent a new federal definition of consent applicable only to third-party releases. This Court should decline that invitation because, even if debtors are correct that federal law governs the question whether a third-party release is consensual, debtors have failed to show that federal consent law would deviate from the fundamental contract-law principle that

silence does not manifest agreement. Accordingly, the Court need not reach the choice-of-law issue. And even if federal law conflicted with the otherwise applicable law of consent (which here is supplied by the law of New York), debtors have identified no persuasive reason to override New York law in the circumstances of this case.

**A. The Disputed Release Is Nonconsensual Under Federal Law, Which Recognizes That Silence Does Not Equal Consent.**

As the district court recognized and as this Court has held, federal contract law is clearly defined by reference to the generally applicable principles set forth in the Second Restatement of Contracts. JA15; *see, e.g.*, *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that, "[t]o apply [the] federal common law of contract," courts "look to general principles of contract law" (quotation marks omitted)); *McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099, 1106 (2d Cir. 1990) (similar). Those principles, "as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence." JA15. The disputed release is therefore "nonconsensual under federal law." JA15.

Debtors appear to acknowledge that a release is a contract. Br. 47 ("Individuals and entities often enter into contracts that release claims."). But debtors urge this Court to adopt a federal consent standard that deviates from contract-law principles whenever a release appears in a "bankruptcy plan, which is not a contract." Br. 46

27

(emphasis omitted). As explained, however, a release incorporated into a reorganization plan has legal force because of the prior agreement of the parties governed by the release—that is, because the release is a contract. Debtors have failed to cite any contrary authority.

The contractual nature of a consensual third-party release is not altered, as debtors suggest (Br. 47-48), by the fact that a bankruptcy court must make certain findings before confirming a reorganization plan. The statutory prerequisites for plan confirmation do not convert a third-party release into something other than a contract. They merely prevent bankruptcy courts from confirming a plan, whether it contains consensual releases or not, unless certain criteria are met.

## B. In the Event of a Conflict, Federal Law Would Not Govern Whether the Disputed Release Is Consensual.

Because the release is nonconsensual under any conceivably applicable law of consent, the district court appropriately declined to address the choice-of-law issue. JA12. If this Court reaches that question, however, the Court should reject debtors' argument that federal law should override the otherwise applicable law of consent, supplied here by the law of New York.

"[T]he basic federal rule in bankruptcy is that state law governs the substance of claims . . . ." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (quotation marks omitted). That is because "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the

debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000). Courts have therefore applied state law of consent even to questions at the very heart of bankruptcy, such as whether a creditor has entered into a valid settlement agreement of its claims against a debtor. *E.g.*, *American Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1023 (8th Cir. 2010); *In re Omni Video, Inc.*, 60 F.3d 230, 232 (5th Cir. 1995). That question is not meaningfully different from the question presented here: whether the disputed release, which falls well outside bankruptcy's traditional scope because it purports to be a contract between nondebtors and other nondebtors to release claims that neither belong to nor flow against the debtor, is consensual.

To determine which jurisdiction's law should govern, bankruptcy courts apply the choice-of-law rules of the forum state. *See In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001). Here, the forum is New York. JA22. New York generally applies its own law absent any relevant conflict. *IBM Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004). And debtors have failed to identify any such conflict; indeed, even the bankruptcy court acknowledged that "state contract laws generally do not recognize silence as consent to a contract." JA13 (citation modified). New York law therefore governs this case. As the district court held, JA13, the courts of New York have "repeatedly" applied the Second Restatement of Contracts to hold that "a binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement." *Wu v. Uber*

29

*Techs., Inc.*, 260 N.E.3d 1060, 1070 (N.Y. 2024) (quotation marks omitted); *accord Karlin v. Avis*, 457 F.2d 57, 62 (2d Cir. 1972) (recognizing that "[t]he New York law on silence as acceptance is firmly supported by the Restatement of Contracts"). Under those principles, the opt-out release—which deems silence to be consent—is nonconsensual and therefore unlawful.

Debtors argue (Br. 51) that that consent issue must be governed by a uniform bankruptcy-specific rule because "there is a strong federal interest in the validity of bankruptcy plan provisions." But this is not one of the "few and restricted" circumstances "in which judicial creation of a special federal rule would be justified." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (quotation marks omitted). Whether "latent federal power . . . displace[s] state law is primarily a decision for Congress, not the federal courts." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (quotation marks omitted). And the Supreme Court has rejected the idea that federal common law must control simply because a question arises "in the context of a federal bankruptcy." *Rodriguez v. FDIC*, 589 U.S. 132, 137 (2020).

Debtors' principal justification (Br. 44) for creating a special federal rule is that "uniformity principles" demand it. Again, however, debtors have failed to identify any relevant jurisdiction whose law would treat silence as consent outside of the exceptional circumstances identified by the Second Restatement of Contracts. Any alleged disuniformity is therefore illusory. Debtors' suggestion (Br. 52 n.7) that

30

disuniformity would result in an "unworkabl[e]" bankruptcy system fails for the same reason.

Debtors also seek to justify (Br. 47-48) the adoption of a federal rule on the ground that a bankruptcy court's authority to approve, modify, and reject reorganization plans derives from federal law. But the mere fact that a court is exercising federally conferred authority does not itself establish that federal law must apply. Otherwise, bankruptcy courts would have to apply federal law even to the substance of claims against the debtor. *But see Travelers Cas. & Sur. Co. of Am.*, 549 U.S. at 450. And every exercise of diversity jurisdiction—conferred upon federal courts by a federal statute, 28 U.S.C. § 1332—would have to be governed by federal law. *But see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Moreover, the scope of a bankruptcy court's authority over reorganization plans has no bearing on the analytically distinct question whether a third-party release between two or more nondebtors is consensual. Because the Bankruptcy Code contains no definition of consent that would apply in this context, the relevant law should be drawn from applicable non-bankruptcy law—here, the generally applicable law of consent as reflected in the Restatement of Contracts.

Finally, debtors attempt to recharacterize (Br. 45-46) the question whether a release is consensual as a procedural question, not a substantive one. But the law governing whether a party has assented to a contract is dispositive of the question whether a contract exists. The rule governing the existence or absence of consent to a

31

third-party release is thus a substantive "rule[] of decision by which [a] court will adjudicate [the released parties'] rights," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (Scalia, J.) (quotation marks omitted), that cannot plausibly be characterized as procedural.

In arguing otherwise, the debtors observe that Federal Rule of Civil Procedure 23 contains provisions governing "absent class members' consent to the adjudication of their rights." Br. 45-46 (citing Fed. R. Civ. P. 23(c)). But that says nothing about whether the law of consent for third-party releases is substantive or procedural, since "a valid Rule of Civil Procedure displaces contrary state law even if the state law would qualify as substantive." *Berk v. Choy*, 607 U.S. 187, 192 (2026). To the extent Rule 23 is relevant, the Rule's express deviation from ordinary consent principles only underlines the absence of any analogous deviation (outside the asbestos context) in the Bankruptcy Code.

### C. Debtors' Policy Arguments Lack Merit.

"Faced with so many marks against [their] interpretation of the law," debtors, like the plan proponents in *Purdue*, "resort to a policy argument." 603 U.S. at 224. But as *Purdue* held, federal courts "are the wrong audience" for these concerns. *Id.* at 226. A court's "only proper task is to interpret and apply the law," and as explained above, the disputed release cannot be reconciled with black-letter law governing consent. *Id.*

32

Debtors' policy arguments lack merit even taken on their own terms. Debtors emphasize (Br. 60) that "no creditor has opposed" the release in this litigation. As shown, however, the absence of express opposition is not equivalent to support. Debtors also argue that "releases with opt-out consent will often be necessary to the success of a reorganization plan." Br. 32 (quotation marks omitted). But that is indistinguishable from the policy argument the Supreme Court rejected in *Purdue*. 603 U.S. at 226.

Indeed, *Purdue* illustrates why courts should be skeptical of self-serving assertions about what terms are essential for a reorganization to succeed. The proponents of the *Purdue* plan initially represented that the plan confirmed by the bankruptcy court—in which the Sacklers, who were not debtors in Purdue's bankruptcy, "proposed to return to Purdue's bankruptcy estate $4.325 billion of the $11 billion they had withdrawn from the company in recent years" in exchange for a nonconsensual third-party release terminating essentially all opioid-related claims against them, *id.* at 211—was the "best available" deal by a "very wide margin," Brief of the Debtors-Appellees at 21, *In re Purdue Pharma L.P.*, No. 21-cv-7532 (S.D.N.Y. Nov. 15, 2021), Dkt. No. 151. After the district court held that the release was unlawful, the plan proponents managed to "reach[] a new agreement" that involved "up to an additional $1.675 billion" in payments from the Sacklers. Reply in Support of Application for a Stay of the Mandate of the United States Court of Appeals for the Second Circuit Pending the Filing and Disposition of a Petition for a Writ of

Certiorari at 27, *Harrington v. Purdue Pharma L.P.*, No. 23A87 (U.S. Aug. 7, 2023), Dkt. No. 10. And after the Supreme Court held that the Bankruptcy Code does not permit nonconsensual releases, the parties agreed to a consensual third-party release involving an "aggregate payment" of "up to $7 billion." Disclosure Statement for Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors at 7, *In re Purdue Pharma L.P.*, No. 19-23649 (S.D.N.Y. Bankr. June 20, 2025), Dkt. No. 7613.

## CONCLUSION

For these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

LISA A. TRACY
*Deputy General Counsel*

BETH A. LEVENE
*Associate General Counsel*

FREDERICK GASTON HALL
*Trial Attorney*
*Executive Office for U.S. Trustees*
*U.S. Department of Justice*

MICHAEL S. RAAB
MICHAEL SHIH
*Attorneys, Appellate Staff*
*Civil Division, Room 7268*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-6880*
*Michael.Shih@usdoj.gov*

July 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,541 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Michael Shih
MICHAEL SHIH

**ADDENDUM**

**TABLE OF CONTENTS**

11 U.S.C. § 1123 .................................................................................................. A1

**11 U.S.C. § 1123**

### § 1123. Contents of plan

**(a)** Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall--

**(1)** designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

**(2)** specify any class of claims or interests that is not impaired under the plan;

**(3)** specify the treatment of any class of claims or interests that is impaired under the plan;

**(4)** provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

**(5)** provide adequate means for the plan's implementation, such as--

**(A)** retention by the debtor of all or any part of the property of the estate;

**(B)** transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

**(C)** merger or consolidation of the debtor with one or more persons;

**(D)** sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

**(E)** satisfaction or modification of any lien;

**(F)** cancellation or modification of any indenture or similar instrument;

**(G)** curing or waiving of any default;

**(H)** extension of a maturity date or a change in an interest rate or other term of outstanding securities;

**(I)** amendment of the debtor's charter; or

**(J)** issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

**(6)** provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities,

A1

and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

**(7)** contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

**(8)** in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

**(b)** Subject to subsection (a) of this section, a plan may--

**(1)** impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

**(2)** subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

**(3)** provide for--

**(A)** the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

**(B)** the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

**(4)** provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

**(5)** modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

**(6)** include any other appropriate provision not inconsistent with the applicable provisions of this title.

A2

**(c)** In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.

**(d)** Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.